# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| STEWART N. GOLDSTEIN, individually and on behalf of all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | C.A. No. 2020-1061-JTL |
| ALEXANDER J. DENNER, SARISSA CAPITAL MANAGEMENT, L.P., SARISSA CAPITAL DOMESTIC FUND LP, SARISSA CAPITAL OFFSHORE MASTER FUND LP, and SARISSA CAPITAL MANAGEMENT GP LLC, | ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## OPINION IMPOSING SANCTIONS FOR FAILURE TO PRESERVE ELECTRONICALLY STORED INFORMATION

Date Submitted: January 16, 2024
Date Decided: January 26, 2024

Kevin H. Davenport, John G. Day, Jason W. Rigby, PRICKETT, JONES & ELLIOT P.A., Wilmington, Delaware; R. Bruce McNew, COOCH & TAYLOR P.A., Wilmington, Delaware; Christopher H. Lyons, ROBBINS GELLER RUDMAN & DOWD LLP, Wilmington; Delaware; Randall J. Baron, Rick T. Atwood, ROBBINS GELLER RUDMAN & DOWD LLP, San Diego, California; Brett Middleton, JOHNSON FISTEL, LLP, New York, New York; *Attorneys for Plaintiff.*

Stephen E. Jenkins, Richard D. Heins, ASHBY & GEDDES, P.A., Wilmington, Delaware; Tariq Mundiya, Sameer Advani, Richard Li, M. Annie Houghton-Larsen, WILLKIE FARR & GALLAGHER LLP, New York, New York; *Attorneys for Defendants Alexander J. Denner, Sarissa Capital Management LP, Sarissa Capital Domestic Fund LP, Sarissa Capital Offshore Master Fund LP, and Sarissa Capital Management GP LLC.*

**LASTER, V.C.**

The plaintiff contends that the principal of an activist hedge fund breached his fiduciary duties by engaging in insider trading. The plaintiff has moved for sanctions based on the defendants' failure to preserve electronically stored information ("ESI").

The plaintiff served document requests that asked for the hedge fund principal's texts. The defendants did not produce any texts and averred that texting was contrary to the fund's business policies. When other parties produced texts with the hedge fund principal, the plaintiff pressed the issue. After concluding that the hedge fund and its principal had spoliated evidence, the plaintiff filed a motion for sanctions for failing to preserve ESI.

The hedge fund principal received three litigation hold notices that instructed him to take affirmative steps to preserve texts on his personal devices. The hedge fund principal did nothing. He now posits that his texts were lost in October 2021, when he upgraded to a new iPhone. Even the defendants admit his explanation makes no sense, because Apple backs up iMessages and other data to the cloud. The hedge fund principal has not suggested that other data was lost, such as pictures, applications, or contacts. Rather than remembering a devastating loss of all his data, he barely recalls the event. The iPhone upgrade thus not only uncharacteristically resulted in a loss of data, but strangely resulted only in the loss of texts.

The plaintiff then asked for texts from other key hedge fund personnel. Eight months later, the hedge fund responded that its general counsel had no texts and couldn't explain why. He now posits that his texts disappeared in early October 2020. He recalls that he was personally cleaning his swimming pool when he accidentally

dropped his phone into the water. He sent the phone to be repaired, and he thinks the repair must have caused his texts to be lost. Like the hedge fund principal, the general counsel does not recall a painful disappearance of all his data, including treasured pictures, his applications, and contacts. He only dredged an insignificant event from memory after finding a receipt for the repair.

For purposes of this litigation, the disappearance of the hedge fund principal's texts proved serendipitous. The plaintiff had just served a comprehensive document request. Weeks later, the defendants moved to stay discovery, where they argued carefully that a stay would not prejudice the plaintiff because no *then-existing* evidence would be lost. The court denied the stay.

The hedge fund's head trader also has no texts. But in lieu of a third suspiciously flukey data loss, he admits setting his iPhone to delete texts after thirty days. Even after receiving a litigation hold, he never changed that setting.

Court of Chancery Rule 37(e) governs when a requesting party can obtain sanctions for a responding party's failure to preserve ESI. To obtain sanctions, the requesting party must show (i) the responding party had a duty to preserve the ESI, (ii) the ESI is lost, (iii) the loss is attributable to the responding party's failure to take reasonable steps to preserve the ESI, and (iv) the requesting party suffered prejudice. To obtain a presumption or a default judgment, the requesting party must show that the responding party acted recklessly or with the intention of preventing another party from using the evidence in litigation.

The plaintiff made each showing. The hedge fund and its principal had a duty to preserve ESI. That duty arose at least as early as February 2018, when the hedge fund principal received the first litigation hold notice. The hedge fund and its principal failed to take reasonable steps to preserve texts, most notably by not imaging any personal devices. The texts were lost due to that failure.

The plaintiff suffered twofold prejudice from the loss. The plaintiff cannot use the evidence to prove its affirmative case. The plaintiff also cannot use the evidence to cross-examine the hedge fund principal and other defense witnesses when they attempt to prove their defenses.

To remedy the first category of prejudice, the court will presume at trial that the hedge fund traded on the basis of a non-public approach from an acquiror. The court also will presume that the hedge fund's trading caused the sale process to fall outside a range of reasonableness.

To remedy the second category of evidence, the court will require the defendants to meet a burden of proof that is increased by one level. Rather than rebutting the presumptions or proving issues by a preponderance of the evidence, the defendants will have to adduce clear and convincing evidence.

The plaintiff also has been prejudiced by having to spend time and resources on this issue. The defendants must pay all of the fees and expenses that the plaintiff incurred. That includes not only the motion itself, but also the time required to pin down the defendants on their positions and to confirm that the ESI was not available from other sources.

# I.    FACTUAL BACKGROUND

The facts are drawn from the parties' submissions in connection with the motion seeking sanctions for spoliation.[1] The court has also considered other documents of record.

## A.    Denner, Bioverativ, and Sanofi

Defendant Alexander J. Denner is the founder and controlling principal of Sarissa Capital, an activist hedge fund. Four of his affiliates are defendants (collectively, "Sarissa").

In 2017, Denner was a director of Bioverativ, Inc., a publicly traded biotechnology company. In May, Sanofi S.A. approached Denner and another director, Brian S. Posner. Sanofi expressed interest in acquiring Bioverativ for $90 per share. Bioverativ's common stock closed that day at $54.86 per share, so the proposal represented a 64% premium to market.

Denner and Posner told Sanofi that the time was not right for an acquisition. The discovery record to date indicates that Posner reported Sanofi's interest to Bioverativ's other directors, but did not mention the price. There are no contemporaneous documents evidencing board consideration or acknowledgement of the offer, and there was no board vote on a response. All of the Bioverativ directors testified that they knew about Sanofi's approach. Except for Posner and Denner, none

---

[1] Citations in the form "PX __" refer to exhibits the plaintiff submitted by affidavit Dkts. 195, 204. Citations in the form "DX __" refer to exhibits the defendants submitted by affidavit. Dkt. 199.

recalled knowing the price. A contemporaneous email from Posner to outside counsel references the Sanofi approach without mentioning the price. DX 14.

**B.      Sarissa Buys Stock.**

Just days after Denner's meeting with Sanofi, Sarissa's head trader began purchasing Bioverativ stock.

- On May 24, 2017, Sarissa purchased 340,000 shares.

- On May 25, 2017, Sarissa purchased 130,000 shares.

- On May 26, 2017, Sarissa purchased 450,000 shares.

- On May 30, 2017, Sarissa purchased 90,000 shares.

There is no contemporaneous evidence of any prior plan to rapidly acquire such a large position. The only written communication relating to the trades is an email in which Denner tells the head trader to "Keep going." PX 3.

Before those purchases, Sarissa only owned 155,000 shares. Within a week after Denner's meeting with Sanofi, Sarissa had purchased 1,010,000 shares for $56.3 million. Bioverativ stock went from 3.3% of Sarissa's portfolio to 27.7%.

Before Sarissa's first purchase, its general counsel (Mark DiPaolo) emailed Bioverativ's general counsel (Andrea DiFabio) to ask if she was aware of any material non-public information that could limit Sarissa's ability to trade. DiPaolo did not mention Sanofi's $90 per share offer, and DiFabio testified that she did not know about it. She therefore told DiPaolo that she did not know of anything.

Posner was the only other Bioverativ director who knew about the price. He bought 2,000 shares for approximately $53.80 per share, representing a total

5

investment of $107,600. No one has suggested that the other Bioverativ directors suddenly purchased shares.

## C.     Denner Strings Sanofi Along.

Sarissa stood to make massive profits if Sanofi acquired Bioverativ, but Section 16(b) of the Securities Exchange Act of 1934 loomed as an impediment. That statute requires that an insider disgorge short-swing profits from any sale that takes place less than six months after the purchase. Denner's solution was to delay any engagement with Sanofi so that the sale would take place after the short-swing period closed.

When Sanofi reapproached in June 2017 and again in September 2017, Denner responded that Bioverativ was not for sale. The discovery record indicates that he did not report those contacts to the board. *See* PX 11.

## D.     Bioverativ Agrees To A Sale.

By October 2017, the short-swing period was about to expire. This time, when Sanofi came calling, Denner proposed a single-bidder process. The board knew nothing about that inquiry.

Several weeks later, in late November 2017, Sanofi offered to acquire Bioverativ for $98.50 per share. Bioverativ's management team and its financial advisors valued the company at more than $150 per share. After receiving Sanofi's offer, the directors asked for a higher bid, and Sanofi increased its offer to $101.50. At that point, the directors countered at $105 per share, almost one-third below the standalone valuation. Sanofi accepted.

Denner led the negotiations for Bioverativ. Stephen Sands, a Lazard banker, led the negotiations for Sanofi. Denner and Sands had known each other professionally for over a decade. The discovery record reveals that they texted during the negotiations. None of those texts exist.

## E. The Bioverativ Hold

On January 21, 2018, the companies announced the transaction. On February 8, 2018, Bioverativ filed its proxy statement.

Stockholders filed putative class actions challenging the sufficiency of the proxy statement. On February 21, 2018, Bioverativ's general counsel circulated a litigation hold. PX 12 (the "Bioverativ Hold"). Denner received it.

The Bioverativ Hold informed its recipients that "Bioverativ and its employees are under an obligation to hold on to any and all information and documents (including electronically-stored information, such as emails) within their possession, custody or control that may relate to Bioverativ's acquisition by Sanofi." *Id.* The Bioverativ Hold instructed recipients to take affirmative steps to preserve documents. Under a heading titled, "What do I need to do?" it stated:

> You must take affirmative steps to prevent any alteration, deletion, destruction, or modification of any information or documents you possess now or in the future that could be related to the hold
>
> To be clear, this legal hold applies to documents and information within Bioverativ's possession, custody or control or your individual or future possession, custody or control.

*Id.*

The Bioverativ Hold expressly extended to texts. Under a heading titled, "Other than email, what items do I need to hold on to?" the notice stated:

7

Please review the list below. You must hold on to any information, documents and data stored in or on any medium—paper, electronic, or other—that may be relevant to Bioverativ's acquisition by Sanofi even if you keep it on your mobile device or on your home computer. This includes but is not limited to: . . .

· SMS or text messages; . . .

· Documents and information stored in a cloud environment.

To be clear, any and all documents, data and information that may relate to Bioverativ's acquisition by Sanofi should be preserved regardless of whether they are favorable or unfavorable to Bioverativ, or whether they appear unimportant or trivial.

*Id.* The Bioverativ Hold extended explicitly to "personally-owned computers or devices (including cell phones, tablets, etc.)." *Id.*

There is no evidence Denner took any action in response to the Bioverativ Hold. There is no evidence that Sarissa took any action either. If they had, the lost texts would have been preserved.

**F.      The Sanofi Hold**

On March 15, 2018, Sanofi issued a litigation hold. PX 13 (the "Sanofi Hold"). Denner received it.

The Sanofi Hold specifically called out texts on smart phones. Under the heading "**YOU MUST PRESERVE BOTH DOCUMENTS AND ELECTRONICALLY STORED INFORMATION**," it stated:

You must retain paper documents and ESI regardless of location or media format. For example, you must retain relevant ESI on computers and external storage devices such as cell phones, smartphones, iPads, tablets, and removable media such as USB drives. . . .

**Examples of ESI:** . . . text messages . . . on any personal devices.

*Id.*

The Sanofi Hold specifically identified the need to take affirmative steps to preserve ESI. Under a heading titled, "**DO NOT DELETE RELEVANT INFORMATION**," the Sanofi Hold stated:

> Do not delete e-mail or ESI that relates to this matter . . . If you are aware of any other documents or information that may relate to this Matter that are stored in any other format or location where they are likely to be modified or deleted (either due to automatic or manual processes), you must take affirmative actions to preserve these documents and information.

*Id.*

There is no evidence that Denner took any action in response to Sanofi Hold. There is no evidence that Sarissa took any action either. If they had, the lost texts would have been preserved.

**G.      The Sarissa Hold**

On September 4, 2019, the Securities and Exchange Commission ("SEC") served subpoenas on Denner and Sarissa seeking "All Documents Concerning [Bioverativ] or trading in the securities of [Bioverativ]," "All Communications with Sanofi," and "All Communications with Denner Concerning Sanofi, [Bioverativ], or trading in the securities of [Bioverativ]." Dkt. 212, Ex. A at Request Nos. 3–5 & Ex. B at Request Nos. 3, 5. On September 5, 2019, Sarissa's general counsel (DiPaolo) circulated a litigation hold to "All staff." PX 15 (the "Sarissa Hold").

The Sarissa Hold instructed all staff to "preserve any and all documents and/or communications with, concerning, relating to, or in any way discussing or mentioning Bioverativ, Inc. or Sanofi S.A." *Id.* It continued: "**Until otherwise notified, do not discard, delete, alter or destroy any such materials in your possession or**

**under your control even if such documents would otherwise be routinely discarded or destroyed in the ordinary course of your business.**" *Id.*

The Sarissa Hold expressly encompassed texts on personal devices:

> You must preserve <u>all</u> potentially responsive documents now in existence or that may be created in the future, whether in hard-copy form or stored electronically, including electronic documents stored on or in any form of media, including, but not limited to, the following: mobile devices, whether firm issued or personal (including iPhones, Androids, and Blackberries), . . . iPads, tablet devices, PDAs, . . . and information available in the "cloud" or on social media websites. . . . **All destruction or recycling programs, protocols and routines that would otherwise apply to the documents being preserved must be suspended immediately.**

*Id.*; *accord id.* (defining "document" to include "text messages").

After circulating the Sarissa Hold, DiPaolo consulted with outside counsel about how to implement it.[2] Outside counsel asked DiPaolo about texts. DiPaolo responded that he did not text for business and that he did not believe Denner did either, but he would verify that. DiPaolo and outside counsel decided they would not collect text messages at that time, but outside counsel asked that Sarissa's users preserve text messages and check with counsel before buying a new phone and transferring data to a new device.

DiPaolo avers that he personally went through Denner's phone looking for text messages relating to "Sarissa's purchases of Bioverativ securities." DiPaolo Aff. ¶ 6. The scope of the SEC subpoenas was much broader: They sought "All

---

[2] Sarissa produced notes from two meetings subject to a Rule 510(f) order. Neither the production of the evidence nor this decision's reference to it waives any privilege that otherwise might attach to the documents.

Communications with Denner Concerning Sanofi, [Bioverativ], or trading in the securities of [Bioverativ]." Dkt. 212, Ex A at Request No. 4.

DiPaolo claims he did not find any responsive texts. In this action, other parties have produced texts from Denner relating to Bioverativ. There are also emails referring to texts from Denner relating to Bioverativ. DiPaolo either applied his narrow definition to exclude them, missed them inadvertently, or consciously ignored them. The latter is a concern, because to the extent that Denner texted about Sarissa's trading, he likely texted with DiPaolo. Allowing DiPaolo to review Denner's texts meant DiPaolo was looking for texts that could implicate himself.

At a follow-up meeting with outside counsel, DiPaolo reported that Sarissa's policies prohibited the use of text for business purposes. He reiterated that he had no recollection of texting himself. He said that he had reviewed Denner's texts and found nothing.

Based on DiPaolo's representations, outside counsel agreed to "table any collection of mobile data/text messages at this time but asked [Denner] to preserve this data." Outside counsel also asked Denner to contact counsel "for guidance should he want to buy a new device or discard the current device."

There is no evidence that any steps were taken to preserve Denner's data. There is no evidence that Denner contacted anyone for guidance before replacing his phone.

Because the Sarissa Hold went to all staff, it inferably went to Pat Garofalo, Sarissa's head trader. He had his phone set to delete texts after thirty days. He did

11

not turn off that setting after receiving the Sarissa Hold. He did nothing to preserve his texts.

DiPaolo sent the Sarissa Hold, so he necessarily knew about it. He did nothing to preserve his texts either.

The three custodians for the SEC collection ended up being Denner, DiPaolo, and Denner's former personal assistant, who had left Sarissa in September 2018. No one collected her cell phone before she left. The SEC collection thus did not involve *any* collection of texts, nor *any* imaging of phones to preserve ESI. DiPaolo conducted the only search for texts by reviewing Denner's phone. That was a manual self-collection by an inferably interested party.

## H.    The Pool Incident

After the SEC collection, the DiPaolo was personally cleaning his swimming pool when he accidentally dropped his phone into the water. He has a receipt showing he had the phone repaired on September 28, 2020.

DiPaolo believes that he lost his texts when the phone was repaired. Strangely, the repair seems to have affected his texts and nothing else. DiPaolo has not suggested that he lost other data, such as pictures, applications, or contacts. Rather than recalling a traumatic event involving the disappearance of treasured photos and the hassle of rebuilding his contacts and restoring other information, DiPaolo barely remembers the incident. Only the repair receipt jogged his memory.

Nor do the dates work. DiPaolo believes he lost his texts as a result of the repair, yet the missing texts are not tied to September 28, 2020. He has no texts from

12

before October 9, 2020. It would be strange for a repair to cause the loss of texts sent during the twelve days after the repair took place.

## I. This Lawsuit

On December 15, 2020, the plaintiff filed this lawsuit. Based on Sarissa's stock purchases, the plaintiff asserts a claim against Denner for breach of fiduciary duty, plus a claim against Sarissa for aiding and abetting Denner's breaches. In substance, the plaintiff asserts that Denner and Sarissa engaged in insider trading. The plaintiffs also asserted claims against other defendants that have been settled.

Denner and Sarissa moved to dismiss the claims against them under Rule 12(b)(6). After completing briefing, the plaintiff served document requests on September 27, 2021. Dkt. 44.

The defendants responded by moving to stay discovery. They relied on a line of Court of Chancery decisions that freely grant stays of discovery pending resolution of motions to dismiss. *See* Dkt. 47. Those rulings presume that a stay will not prejudice the plaintiff because the defendants will preserve potentially relevant evidence. Citing those precedents, the defendants argued that the plaintiff would not suffer prejudice in this case due to the absence of "any serious risk of currently-available information becoming unavailable while the Court considers the pending Motions to Dismiss." *Id.* ¶ 17. In reply, the defendants reiterated that the plaintiff did not face any risk of prejudice from his "professed concerns" about failures to preserve evidence. Dkt. 52 ¶ 17. Although not conspicuous at the time, the defendants' reference to "currently-available information becoming unavailable" now seems carefully worded.

13

On November 18, 2021, the court issued an order that denied the defendants' motion for a stay, explaining:

> As the plaintiffs' authorities recount, defendants are not entitled to an automatic stay of discovery pending disposition of a pleading-stage motion. There must be good reason to grant the stay. Here, the court has reviewed the pleading-stage record, and it appears highly unlikely that the motion to dismiss will be granted, much less dispose of the case in its entirety. It is perhaps possible that a limited aspect of the complaint might be dismissed, but the probability is sufficiently low that discovery should not be stayed pending the outcome of the defendants' pleading-stage motion.

Dkt. 55.

## J. The Defendants Belatedly Take Steps To Identify And Preserve Evidence.

It was only after the court's order that defense counsel began thinking about what sources of evidence would be responsive and should be identified, preserved, collected, reviewed, and potentially produced. That was too late. The plaintiff filed the case in December 2020. Defense counsel should have started taking steps to identify and preserve information by at least then.

Defense counsel acted too late in another sense as well. To repeat, the plaintiff served document requests in September 2021. Soon after, for reasons that no one has been able to explain, Denner lost all of his texts from before an as-yet unidentified date in October 2021. Denner recalls upgrading his iPhone to a new model, and he thinks the upgrade caused the loss. That would be bizarre, because Apple facilitates upgrades by transferring data to the new iPhone from the cloud. No one on the defendants' side has been able to explain why Denner's iPhone upgrade could have caused the loss of his texts.

14

There is no evidence that Denner consulted with anyone before replacing his iPhone. The litigation holds told him to do that. Outside counsel asked him to do that.

Like DiPaolo, Denner has not suggested that he lost other data, such as pictures, applications, or contacts. Denner also does not vividly recall discovering that he had lost cherished photos, nor does he rue the burdens of restoring his data from other sources. He barely remembers it. Like DiPaolo's pool mishap, the atypical iPhone upgrade seems to have affected his texts and nothing else.

## K.     The Defendants Fail To Produce Any Texts.

As noted, defense counsel only began to consider their preservation and collection responsibilities after the court denied the defendants' motion to stay discovery. For their baseline document collection, defense counsel decided to use the documents gathered in response to the SEC subpoenas in September 2019. Defense counsel did not take any affirmative steps to identify custodians or sources.

In January 2022, defense counsel proposed to the plaintiff that Denner be the only custodian. The plaintiff initially did not ask for more custodians. The plaintiff did ask for confirmation that the production would include Denner's personal email, Sarissa email, other business email, instant message, mobile devices, laptops and desktops, cloud storage, and shared network drives. At that point, defense counsel compared those data sources with what had been gathered for the SEC collection and identified additional data that needed to be secured, including potentially text messages, nonbusiness email addresses, cloud-based data, and paper documents. Once again, defense counsel did not act independently or take initiative. They did not

fulfill their own responsibilities to identify data sources; they merely considered what the plaintiff identified.

To learn about texts, defense counsel consulted with Sarissa's general counsel (DiPaolo). He repeated his mantra that Sarissa had a policy against using text messages for business purpose and that he did not believe that Denner had any responsive text messages. Rather than imaging Denner's phone or reviewing his text messages themselves, defense counsel asked Denner's assistant to search his texts.

The plaintiff had requested documents from Denner for months in 2016 that were outside the scope of the SEC collection. In February 2022, defense counsel collected additional documents from Denner's email account. Later that month, the plaintiff and defense counsel agreed on a search protocol for Denner's emails, and the plaintiff agreed that Sarissa did not need to run searches on any other Sarissa personnel. Defense counsel ran the agreed-upon search terms and reviewed the hits for responsiveness, then produced those documents on a rolling basis.

In March 2022, Denner's assistant reported to defense counsel that no text messages from 2017 to 2018 existed on Denner's phone and that the earliest text messages were from October 2021. Denner's assistant also said that Denner did not have any messages available in iCloud. Defense counsel asked for the first time about Denner's iPad and was told no text messages from 2017 to 2018 existed there either. No one told the plaintiff.

In June 2022, the court issued a decision that largely denied Denner and Sarissa's motion. *Goldstein v. Denner*, 2022 WL 1797224 (Del. Ch. June 2, 2022). That

decision found it "reasonable to infer that Denner bought the shares with the expectation that Sarissa would profit from a near-term sale of [Bioverativ]" and "reasonably conceivable that the conduct giving rise to the Insider Trading Claims tainted the sale process." *Id.* at *9, *12. The decision noted that discovery would play an important role in supporting or refuting those inferences and that on a developed record, the court might reject or question whether the defendants had traded based on inside information. For example, discovery might show that Denner "would have increased Sarissa's equity position after the Spinoff in any event." *Id.* at *9 n. 5.

### L. The Plaintiff Questions The Lack Of Texts.

Although Denner and Sarissa's production did not contain any texts, other parties produced texts from Denner. Two directors produced forty-five texts, including texts sent during board meetings in which Denner complained about management's opposition to the Sanofi transaction. *See* PX 1.

On June 14, 2022, the plaintiff informed defense counsel that Denner appeared to have texted for business purposes. The plaintiff asked defense counsel to add the following custodians to the search protocol: Sarissa's general counsel (DiPaolo), Sarissa's Chief Compliance Officer Patrice (Patrice Bonfiglio), and Sarissa's head trader (Pat Garafalo). The plaintiff's counsel also asked to add Denner's assistant.

At this point, defense counsel finally had one of its lawyers inspect Denner's devices. The inspection confirmed that Denner did not have any text messages from before October 2021. Counsel checked Denner's iPad and saw text messages from March 2020, but not earlier. Denner reported that he had not intentionally deleted any text messages relevant to this action and said he did not understand why his text

17

messages from the 2017-2018 time period were missing. Denner suggested that that he had upgraded his iPhone and then provided his old phone to one of his sons. Later that month, DiPaolo reported that Denner's sons had newer devices acquired after the Bioverativ-Sanofi transaction.

Defense counsel discussed the issue of texts with Sarissa's general counsel (DiPaolo) and its chief compliance officer (Bonfiglio), but did not conduct any formal custodian interviews. DiPaolo and Bonfiglio each represented that they adhered to Sarissa's policy of not texting for business. Defense counsel accepted that representation and decided again against imaging phones.

In October 2022, defense counsel finally answered the plaintiffs' interrogatories, which included a question about whether the defendants had preserved potentially responsive information. Seven months after learning that Denner had no texts from before October 2021, defense counsel served an interrogatory response that stated the following:

> [O]n or around October 2021, Alex Denner replaced his iPhone solely for the purposes of upgrading the device, a process which the Sarissa Defendants believe inadvertently caused his text messages prior to that date to no longer be accessible or retrievable from his current device. By way of further response, the Sarissa Defendants state that, in the Sarissa Capital Management LP Compliance Manual and Code of Ethics, Sarissa employees are not permitted to use text messages for official business correspondence (see SAR-BIVVID00000183). The Sarissa Defendants have sought to obtain iCloud backups, have contacted Verizon, have conducted searches of Denner's current iPhone and iPad devices for backup phone data (including with the assistance of Sarissa's outside counsel. . . .), and have been unavailable to identify any means of recovering any text messages during the relevant time period agreed-to by the parties.

PX 17 at Interrogatory No. 27.

18

The defendants thus asserted that Denner lost his texts on some unidentified date in October 2021, one year before. *Id*. To reiterate, that was after Denner had received three litigation hold notices, after this litigation began, after the plaintiff served discovery requests seeking texts, and just before the defendants moved to stay discovery.

The plaintiff understandably viewed Denner's upgrade story as inherently suspicious. During an upgrade, data is transferred to the new iPhone.[3] Denner and Sarissa's representation that they contacted Verizon also did not help. When texting on his iPhone, Denner likely used iMessage, which is an over-the-top ("OTT") messaging service that operates through the web. Unlike SMS texts, OTT messages do not run through a cellular carrier's system, so the carrier has no record of them.

Denner and Sarissa thus offered an explanation for lost texts that made no sense and took steps to locate texts that did not help. Denner and Sarissa also sought to minimize the import of the loss by representing that under Sarissa's Compliance Manual and Code of Ethics, "Sarissa employees are not permitted to use text messages for official business correspondent." *Id*. That reference implied that there were no texts to lose.

---

[3] *Moving to a New iPhone or iPad*, Apple Device Support Tutorials, Apple, https://it-training.apple.com/tutorials/support/sup010 (last visited Jan. 26, 2024). Defense counsel agrees. *See* PX 19 at 3 ("I have personally replaced my own iPhones twice over the years, and to the best of my knowledge did not lose any data.").

Equally important, the defendants' response was misleadingly incomplete. The response said nothing about DiPaolo's prior loss of all of his texts due to the post-swimming-pool repair.

The defendants also provided an incomplete response to another interrogatory. The plaintiff asked defendants to "Identify and describe the methods and/or processes that You used to search for, Identify, collect and review Documents and Communications." PX 17 at Interrogatory No. 28. The response said nothing about the SEC subpoenas, the self-review of Denner's phone in 2019, or almost anything we now know about defense counsel's collection efforts.

On November 14, 2022, Sarissa's Chief Compliance Officer (Bonfiglio) circulated an email to all staff informing them that the Sarissa Hold "initially circulated September 5, 2019, is still in effect, as litigation surrounding the Bioverativ/Sanofi transaction remains pending." PX 18. In other words, there was never a time after September 5, 2019, when Sarissa personnel were released from their obligation to retain ESI, including texts.

## M.    The Plaintiff Tries To Obtain Texts From Other Sources

The plaintiff made efforts to obtain Denner's texts from other sources. They subpoenaed Verizon themselves, but Verizon responded that it did not maintain records of Denner's texts. That makes sense for texts from an OTT messaging application.

The plaintiff also subpoenaed Lazard, which advised Sanofi on the transaction. Recall that Sands was the primary Lazard banker, and he had known Denner for a decade. PX 21 at 12. The two had a friendly relationship, and Lazard emails reference

20

Denner and Sands' texting each other. *See* PX 5, 7, 10. But Lazard could not produce any texts either. Lazard represented that Sands "no longer has the phone that he used during the relevant time period" and "his current phone does not have any text messages dating back to the relevant period." PX 16.

## N.     More Issues With Texts

On December 7, 2022, during deposition preparation, Sarissa's head trader (Garofalo) informed defense counsel that he recalled using texts to communicate with Denner. But he said he had no recollection of any text messages relating to Bioverativ.

Based on this disclosure, defense counsel finally collected cell phones from DiPaolo, Bonfiglio, and Garofalo.

- DiPaolo's phone had no messages from before October 9, 2020. He claimed not to know why.

- Garofalo's phone had no messages. It was set to delete text message data routinely every thirty days.

- Bonfiglio's device contained 116,868 text messages. The earliest text message was dated January 30, 2014. None of the search terms hit on any texts. In addition, defense counsel reviewed all of the texts and determined that none are responsive.

In short, none of the additional custodians had responsive texts.

In February 2023, the plaintiff pushed for more information about the defendants' failure to produce texts. DX 32. Defense counsel responded with a letter plus a declaration from Denner. In both documents, they stuck to Denner's story about losing his texts when he upgraded his iPhone. At the same time, they seemed to know that the story did not make sense. *See* PX 19. The defendants also reported for the first time that DiPaolo, Garafalo, and Bonfiglio did not possess any responsive

texts. And they reported for the first time that Denner's assistant during the relevant period had left Sarissa in September 2018 and that no one had collected her phone.

## O.     The Motion For Sanctions

On November 14, 2023, the plaintiff moved for sanctions for spoliating evidence. The parties briefed the motion, and the court held a hearing on January 4, 2024. During the hearing, defense counsel was unable to answer basic questions about the collection process. To ensure that the defendants had the opportunity to document what they had done, the court directed the defendants to file an affidavit describing their preservation and collection plan and how they carried it out.

The defendants filed two affidavits. Defense counsel submitted an affidavit detailing their collection efforts. DiPaolo submitted a separate affidavit in which he recounted the swimming pool story for the first time. DiPaolo also reported that he had notes documenting the advice defense counsel gave for collecting and preserving documents in response to the SEC subpoenas. Sarissa offered to produce the notes under a Rule 510(f) order. The court entered a Rule 510(f) order and authorized the plaintiff to file a sur-reply.

DiPaolo did not address in his affidavit whether any of his data was backed up to the cloud or whether counsel had made any efforts to check his other devices. The court directed defense counsel to file a supplemental affidavit "explaining whether any efforts were made to examine DiPaolo's other devices, the cloud, or other sources for texts after the . . . swimming pool incident." Dkt. 213.

Defense counsel reported that no data was backed up to the cloud or available from other devices. Defense counsel did not say what they did, or when, to make this

22

determination. Their silence suggests that they only took those steps after the court asked. In any event, the failure to provide any detail beyond a clipped response is a further example of defense counsel's lack of transparency and parsimony regarding the release of information. That approach has undermined their credibility on the spoliation issues.

## II. LEGAL ANALYSIS

The plaintiffs seek sanctions for spoliating text messages. Spoliation is the destruction or significant alteration of evidence, the failure to preserve evidence properly for another's use, or the improper concealment of evidence.[4]

The plaintiff sought texts, which "fit comfortably within the scope of materials that a party may request under Rule 34."[5] Text messages are a form of ESI.[6]

Court of Chancery Rule 37(e) addresses sanctions for failure to preserve ESI. It states:

> If ESI that should have been preserved in the reasonable anticipation of or actual notice of imminent litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:
>
> (1) upon finding prejudice to another party from loss of information, may order measures no greater than necessary to cure the prejudice; or

---

[4] *See West v. Goodyear Tire & Rubber Co.,* 167 F.3d 776, 779 (2d Cir. 1999); *Matter of In re Skanska USA Civ. Se. Inc.*, 340 F.R.D. 180, 184 (N.D. Fla. 2021).

[5] *Paisley Park Enters., Inc. v. Boxill*, 330 F.R.D. 226, 234 (D. Minn. 2019); *accord Flagg v. City of Detroit*, 252 F.R.D. 346, 352–53 (E.D. Mich. 2008).

[6] *Living Color Enters., Inc. v. New Era Aquaculture, Ltd.*, 2016 WL 1105297, at *3 (S.D. Fla. Mar. 22, 2016).

23

(2) only upon finding that the party acted recklessly or with the intent to deprive another party of the information's use in the litigation, may, among other things:

    (A) presume that the lost information was unfavorable to the party; or

    (B) dismiss the action or enter a default judgment.

Ct. Ch. R. 37(e).

Rule 37(e) reflects longstanding public policies. Seven decades ago, the Delaware Supreme Court cited the maxim that "everything will be presumed against the despoiler" and explained that it is "the duty of a court . . . to adopt a view of the facts as unfavorable to the wrongdoer as the known circumstances will reasonably admit." *Equitable Tr. Co. v. Gallagher*, 102 A.2d 538, 541 (Del. 1954). Imposing sanctions for spoliation embodies the more general policy that "[n]o one shall be permitted to profit by his own fraud, or to take advantage of his own wrong, or to found any claim upon his own iniquity, or to acquire property by his own crime." *Riggs v. Palmer*, 22 N.E. 188, 190 (N.Y. 1889).

Court of Chancery Rule 37(e) closely resembles Federal Rule of Civil Procedure 37(e), as amended in 2015, but with changes to conform to Delaware law and Chancery practice. The federal rules first addressed the preservation of ESI in 2006, but that version of Rule 37(e) proved unsatisfactory. Different federal courts reaching different conclusions "about how to determine when sanctions were warranted, what standards of culpability should apply to different kinds of sanctions, and what types of sanctions should be ordered." Tanya Pierce, *Righting the Ship: What Courts Are Still Getting Wrong About Electronic Discovery,* 72 SMU L. Rev. 785, 787 (2019).

The federal rules were amended in 2015 to provide a clearer and more consistent standard for the federal courts. Federal Rule 37(e) now states:

> If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:
>
> (1) upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or
>
> (2) only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:
>
> > (A) presume that the lost information was unfavorable to the party;
> >
> > (B) instruct the jury that it may or must presume the information was unfavorable to the party; or
> >
> > (C) dismiss the action or enter a default judgment.

Fed. R. Civ. P. 37(e). The Advisory Committee notes offer extended commentary to guide its interpretation and application. *See* Fed. R. Civ. P. 37(e) advisory committee's notes [hereinafter AC Notes].

There are two differences between current Court of Chancery Rule 37(e) and current Federal Rule 37(e). One is that Court of Chancery Rule 37(e) omits the reference to instructing a jury that it "may or must presume the information was unfavorable," for the obvious reason that the Court of Chancery does not have juries.[7]

---

[7] Technically, that is an overstatement. The Court of Chancery has the discretionary authority to empanel a jury to try discrete factual issues. 10 *Del. C.* § 369 ("When matters of fact, proper to be tried by a jury, arise in any cause depending in Chancery, the Court of Chancery may order such facts to trial by issues at the Bar of the Superior Court."). Today, that power is largely vestigial. *See Preston Hollow Cap. LLC v. Nuveen LLC*, 216 A.3d 1, 11 n. 64 (Del. Ch. 2019) ("[T]o the extent a jury in the Court of Chancery is not extinct, it is a vestigial structure, more evocative of the human appendix or coccyx than that vital organ,

25

The federal rule nevertheless provides insight into the types of inferences that a court can draw. First, the court might hold that when acting as factfinder, it *may* presume the information was unfavorable to the party when considering evidence at trial. Alternatively, a court might hold that when acting as factfinder, it *will* presume that the information was unfavorable to the party when considering evidence at trial.

The other difference between current Court of Chancery Rule 37(e) and current Federal Rule 37(e) is the mental state required for imposing the identified sanctions. The Delaware Supreme Court held in 2006 that a court must make an evidence-based "finding of intentional or reckless destruction of evidence as a predicate to an adverse inference . . . ." *Sears, Roebuck & Co. v. Midcap*, 893 A.2d 542, 550 (Del. 2006). Consistent with *Sears*, Court of Chancery Rule 37(e) authorizes the court to impose sanctions requiring a culpable mental state if the party "acted recklessly or with the intent to deprive another party of the information's use in the litigation." Ct. Ch. R. 37(e)(2). The federal version requires that the party have acted "with the intent to

---

the Superior Court petit jury."); *Getty Ref. & Mktg. Co. v. Park Oil, Inc.,* 385 A.2d 147, 151 (Del. Ch. 1978), *aff'd*, 407 A.2d 533 (Del. 1979) (observing that "[t]he old procedure of framing of issues by the Court of Chancery for jury trial is now probably outmoded and this Court is certainly not equipped to hold jury trials itself even if permissible."). Furthermore, "[a] jury trial in Chancery is advisory only. An advisory jury verdict which may be disregarded by the Chancery judge is not entirely equivalent to a jury verdict at law." *Getty*, 385 A.2d at 151; *accord Scotton v. Wright*, 122 A. 541, 542 (Del. Ch. 1923) ("[T]he verdict of the jury on an issue sent by the Court of Chancery to be tried at the bar of the Superior Court, is not binding on the Chancellor; [] the verdict of the jury is only advisory. . . ."). Presumably in a hypothetical case where the Court of Chancery empowered an advisory jury, the court would have the inherent authority to grant the type of instruction contemplated by Federal Rule 37(e)(2)(B). Given the cosmic rarity of this possibility, Chancery Rule 37(e)(2) streamlines practice by omitting it.

26

deprive another party of the information's use in the litigation." Fed. R. Civ. P. 37(e)(2).

## A.      The Threshold Issue Of Timing

Before considering the motion on its merits, the defendants have raised a threshold question of timing. They argue that the court should not consider the motion now, maintaining that the Court of Chancery generally makes spoliation findings just before or after trial. The defendants have collected examples to support that contention,[8] but their examples are just that. They do not establish a general rule, much less a requirement.

As part of its case management authority, a trial court has discretion regarding when to address motions. "Delaware trial courts have inherent power to control their dockets." *Solow v. Aspect Res., LLC*, 46 A.3d 1074, 1075 (Del. 2012). That authority includes determining how to proceed for the "orderly adjudication of claims." *Unbound P'rs Ltd. P'ship v. Invoy Hldgs. Inc.*, 251 A.3d 1016, 1030 (Del. Super. 2021) (cleaned up). Rule 1 instructs the members of this court that the rules "shall be construed, administered, and employed by the Court and the parties, to secure the

---

[8] *See, e.g.*, *Fortis Advisors LLC v. Johnson & Johnson*, C.A. No. 2020-0881-LWW, at 61–62, 78, 129–36 (Del. Ch. June 5, 2023) (TRANSCRIPT) (deferring ruling on spoliation motion until trial or a separate evidentiary hearing because the court "can't possibly make credibility determinations or assess [the custodian's] state of mind on the record that I have before me right now."); *Twitter, Inc. v. Musk*, 2022 WL 5078278, at *5 (Del. Ch. Oct. 5, 2022) (reserving ruling on a motion for adverse inference "pending post-trial briefing, when I have a fuller understanding of the record."); *Kan-Di-Ki v. Suer*, C.A. No. 7937-VCP, at 52–55 (Del. Ch. Sept. 24, 2014) (TRANSCRIPT) (deferring resolution of motion for sanctions at pre-trial conference); *Williams Companies, Inc. v. Energy Transfer LP*, 2020 WL 3581095, at *22 (Del. Ch. July 2, 2020) (ruling that the motion for sanctions at issue "should be dealt with at trial or a separate evidentiary hearing.").

just, speedy and inexpensive determination of every proceeding." Ct. Ch. R. 1. Commenting on the sibling federal rule, a leading treatise states that "[t]here probably is no provision in the federal rules that is more important than this mandate. It reflects the spirit in which the rules were conceived and written, and in which they should be interpreted." 4 Charles Alan Wright, Arthur R. Miller & Adam N. Steinman, *Federal Practice and Procedure* § 1029 (4th ed.), Westlaw (database updated Apr. 2023).

Court of Chancery Rule 16(a) similarly contemplates that a court may take steps to "formulat[e] and simplif[y] . . . . the issues" and to address "[s]uch other matters as may aid in the disposition of the action." Ct. Ch. R. 16(a)(1), (5). The same authoritative treatise explains that "case management [is] an express goal of pretrial procedure." 6A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 1521 (3d ed.), Westlaw (database updated Apr. 2023). To that end, the Advisory Committee's note to the federal rule emphasizes the need for "a process of judicial management that embraces the entire pretrial phase." Fed. R. Civ. P. 16 advisory committee's note to 1983 amendment. The commentary recognizes that "[t]he timing of any attempt at issue formulation is a matter of judicial discretion." *Id.*

Rule 37 "does not contain any specific reference to the timing of the filing of a motion seeking spoliation sanctions." *Goodman v. Praxair Servs., Inc.*, 632 F. Supp. 2d 494, 506 (D. Md. 2009). A review of federal decisions suggests that federal courts primarily encounter the problem of parties raising spoliation issues too late, rather

than too early.[9] For that to be a major concern undercuts the defendants' argument that spoliation issues should wait until trial.

When to address a spoliation issue depends on a variety of factors, including the nature of the issue, the stage of the case, the court's ability to provide case-specific relief, and any scheduling order that might apply.[10] If a party seeks an order compelling the defendants to provide additional discovery or to pay for the movant to conduct additional discovery, then it would be foolish to defer the motion until trial. If a ruling on the motion will help the parties prepare for trial or limit the issues to be addressed at trial, then it often will make sense to address the motion before trial. If the motion turns on evidentiary issues that the court will evaluate at trial, then it will make sense to defer the motion until trial. Ultimately, the decision rests in the discretion of the court based on the facts of each case.

Here, the plaintiff seeks sanctions that will frame the issues for trial. The plaintiff asks for a combination of adverse inferences and preclusion orders. Whether the court grants the requested sanctions or imposes others will determine how the

---

[9] *See GMS Indus. Supply, Inc. v. G&S Supply, LLC*, 2022 WL 853626, at \*4 (E.D. Va. Mar. 22, 2022) (analyzing whether motion was filed late); *McEachron v. Glans*, 1999 WL 33601543, at \*2 (N.D.N.Y. June 8, 1999) (collecting authorities). In those settings, courts have acknowledged that "spoliation sanctions motions often follow only where extensive ESI recovery efforts have failed, or after forensic review gives the movant a much better idea of the quantity and nature of unproduced, deleted ESI." *Steves & Sons, Inc. v. JELD-WEN, Inc.*, 327 F.R.D. 96, 108 (E.D. Va. 2018); *accord GMS Indus.*, 2022 WL 853626, at \*4.

[10] *See Gruenstein v. Browning*, 2022 WL 3213261, at \*3 (N.D. Ill. June 21, 2022) (listing factors); *GMS Indus.*, 2022 WL 853626, at \*4 (same).

parties plan for trial and present evidence. The proper time to consider the plaintiff's motion is now.

**B.    The Rule 37(e) Analysis**

The federal courts have established a step-by-step framework for analyzing spoliation issues under Rule 37(e). *See* Thomas J. Joyce, *Finding Prejudice from Lost ESI: An Analysis of Courts' Standards Under Amended Federal Rule of Civil Procedure 37(e)*, 71 Okla. L. Rev. 979, 980–81 (2019) (collecting cases). This decision adopts and applies that framework.

**1.    Was There A Duty To Preserve The Texts?**

The first question is whether the ESI "should have been preserved." Ct. Ch. R. 37(e). "Rule 37(e) does not apply . . . when information or evidence is lost before a duty to preserve attaches." *Living Color*, 2016 WL 1105297, at *4.

"A party in litigation has an affirmative duty to preserve potentially relevant evidence." *Shawe v. Elting*, 157 A.3d 142, 150 (Del. 2017). A party also must preserve potentially relevant evidence as soon as the party either actually anticipates litigation[11] or reasonably should have anticipated litigation.[12] The latter inquiry is an

---

[11] *See, e.g.*, *Gener8, LLC v. Castanon*, 2023 WL 6381635, at *17 (Del. Ch. Sept. 29, 2023) (tying duty of preservation to defendant's subjective anticipation of litigation while noting that the duty arguably arose earlier); *Beard Rsch., Inc. v. Kates*, 981 A.2d 1175, 1185 (Del. Ch. 2009) (same). For federal cases, *see, e.g.*, *Paisley Park*, 330 F.R.D. at 233.

[12] *See, e.g.*, *Gener8*, 2023 WL 6381635, at *14 ("A party in litigation or who has reason to anticipate litigation has an affirmative duty to preserve evidence that might be relevant to the issues in the lawsuit." (quoting *TR Inv'rs, LLC v. Genger*, 2009 WL 4696062, at *17 (Del. Ch. Dec. 9, 2009)); *Beard Rsch.*, 981 A.2d at 1185 ("A party in litigation or who has reason to anticipate litigation has an affirmative duty to preserve evidence that might be relevant to the issues in the lawsuit."); *Triton Const. Co., Inc. v. E. Shore Elec. Servs., Inc.*, 2009 WL 1387115, at *8 (Del. Ch. May 18, 2009) ("An affirmative duty to preserve evidence

objective one: "[W]hether a reasonable party in the same factual circumstances would have reasonably foreseen litigation." *The Sedona Conference Commentary on Legal Holds, Second Edition: The Trigger & The Process* 354 (2019) (quoting *Micron Tech., Inc. v. Rambus Inc.*, 645 F.3d 1311, 1320 (Fed. Cir. 2011)). "The duty to preserve relevant evidence must be viewed from the perspective of the party with control of the evidence." *Ala. Aircraft Indus., Inc. v. Boeing Co.*, 319 F.R.D. 730, 740 (N.D. Ala. 2017). The Advisory Committee notes to Federal Rule 37(e) explain that the duty to preserve arises when litigation is "reasonably foreseeable." AC Notes. They observe that "[a] variety of events may alert a party to the prospect of litigation." *Id.*

The reasonably foreseeable standard turns on the prospect of litigation, not the specific case or claims that ended up being filed. The reasonable anticipation of one

---

attaches upon the discovery of facts and circumstances that would lead to a conclusion that litigation is imminent or should otherwise be expected."). For federal precedent, *see, e.g.*, *Gruenstein v. Browning*, 2022 WL 3213261, at *6 ("A duty to preserve evidence can arise before litigation starts, and Rule 37(e), which applies to ESI 'that should have been preserved in the anticipation or conduct of litigation,' expressly contemplates this scenario."); *Hollis v. CEVA Logistics U.S., Inc.*, 603 F. Supp. 3d 611, 619 (N.D. Ill. 2022) ("The duty to preserve under Rule 37(e) is based on the common law, and so is triggered when litigation is commenced or reasonably anticipated."); *Eshelman v. Puma Biotechnology, Inc.*, 2017 WL 2483800, at *4 (E.D.N.C. June 7, 2017) (acknowledging that the duty to preserve evidence arises not just during litigation but also before litigation when it is reasonably anticipated); *Core Labs. LP v. Spectrum Tracer Servs., L.L.C.*, 2016 WL 879324, at *1 (W.D. Okla. Mar. 7, 2016) (recognizing a duty to preserve evidence when a party knew or reasonably should have known that litigation is imminent); *Zubulake v. UBS Warburg LLC* (*Zubulake IV*), 220 F.R.D. 212, 216 (S.D.N.Y. 2003) ("The obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation." (quoting *Fujitsu Ltd. v. Federal Express Corp.*, 247 F.3d 423, 436 (2d Cir. 2001)).

lawsuit may trigger a preservation obligation, which may then continue because of other lawsuits.[13]

Once the duty to preserve evidence applies, the party "must not destroy unique, relevant evidence that might be useful to an adversary." *Zubulake IV*, 220 F.R.D. at 217.

> While a litigant is under no duty to keep or retain every document in its possession it is under a duty to preserve what it knows, or reasonably should know, is relevant in the action, is reasonably calculated to lead to the discovery of admissible evidence, is reasonably likely to be requested during discovery and/or is the subject of a pending discovery request.

*Id.* (cleaned up). "The duty to preserve extends to those employees likely to have relevant information—the 'key players' in the case." *Id.* at 218. An organization's decision to circulate a litigation hold notice is a strong indication that a duty to

---

[13] *E.g.*, *Stinson v. City of New York*, 2016 WL 54684, at *4 (S.D.N.Y. Jan. 5, 2016) (finding that "summons quotas were a major issue in . . . an earlier challenge to the NYPD's 'stop and frisk' program. Since the existence of an alleged quota was a '[h]otly contested' issue in [the earlier case] and that case continued up to and beyond the filing of the Complaint in the instant litigation, the City has been on notice that evidence relating to an alleged summons quota is relevant to litigation since at least . . . the date of the filing of the Complaint in [the earlier case], which contained significant quota-related allegations. The duty to preserve evidence therefore arose on that date.") (internal citations omitted); *In re Napster, Inc. Copyright Litig.*, 462 F. Supp. 2d 1060, 1070 (N.D. Cal. 2006) ("[The defendant] should have remained on notice that litigation against them was probable even after the [initial] suit was dismissed. [The defendant] had already been sued once, and there were several indicators that they would be sued again. . . . Accordingly, [the defendant] had a continuing duty to preserve documents after the [initial] lawsuit was dismissed."). *See generally The Sedona Guidelines: Best Practice Guidelines & Commentary for Managing Information & Records in the Electronic Age* 44–47 (2007).

preserve evidence exists, because it shows that the organization subjectively anticipated litigation.[14]

In this case, at a minimum, Denner and Sarissa had a duty to preserve evidence starting on February 21, 2018, when Bioverativ's general counsel circulated the Bioverativ Hold. The duty undoubtedly arose much earlier, because litigation involving M&A transactions is sufficiently common that Denner and Sarissa should have reasonably anticipated litigation challenging the Bioverativ-Sanofi transaction well before that. It would be easy to find that Denner and Sarissa's duty to preserve evidence arose in May 2017, when Denner caused Sarissa to rapidly accumulate a large position in Bioverativ's stock after Sanofi approached Denner and Posner about buying Bioverativ at a price of $90 per share. But such a finding is not necessary to resolve the issues in the case. Relying on the Bioverativ Hold is sufficient.[15]

The duty to preserve evidence extended to all of the Sarissa custodians at issue on this motion. Four of the custodians were obviously key players in Sarissa's

---

[14] *E.g.*, *Skanska USA*, 340 F.R.D. at 186. So is a demand letter threatening litigation. *E.g.*, *Trask-Morton v. Motel 6 Operating L.P.*, 534 F.3d 672, 681 (7th Cir. 2008) (tying preservation obligation to receipt of demand letter); *Does 1–5 v. City of Chicago*, 2019 WL 2994532, at *4 (N.D. Ill. July 9, 2019) ("A demand letter threatening litigation may trigger the duty to preserve documents within its scope."); *Stevenson v. City & Cty. of San Francisco*, 2015 WL 6177363, at *4 (N.D. Cal. Oct. 21, 2015) ("Before litigation begins, courts agree that the receipt of a demand letter, a request for evidence preservation, a threat of litigation, or a decision to pursue a claim will all trigger the duty to preserve evidence." (quoting *In re Ethicon, Inc. Pelvic Repair Sys. Prod. Liab. Litig.*, 299 F.R.D. 502, 512 (S.D. W.V. 2014) (citing cases)).

[15] For the obligation to preserve Denner and DiPaolo's texts, the Sarissa Hold is sufficient. The earlier Bioverativ and Sanofi Holds only matter for the imaging of Denner's assistant's phone and for turning off the head trader's autodelete function.

33

accumulation of stock: Denner himself, Sarissa's general counsel (DiPaolo), Sarissa's head trader (Garafalo), and Sarissa's Chief Compliance Officer (Bonfilglio). Another obvious custodian was Denner's personal assistant, who would possess many of Denner's documents.

The duty to preserve evidence extended to the ESI at issue on this motion. The preservation obligation extended to evidence in Denner or Sarissa's possession, custody, or control. ESI on Denner's personal device was plainly within his possession, custody, or control. Business-related texts on employee personal devices are likewise within an organization's possession, custody, or control.[16]

---

[16] *E.g.*, *Miramontes v. Peraton, Inc.*, 2023 WL 3855603, at \*5 (N.D. Tex. June 6, 2023) (rejecting argument that the defendant did not need to preserve text messages because they were located on custodian's personal phone and holding "the Court finds persuasive Miramontes' evidence that Peraton did not issue company cell phones and Peraton employees regularly conducted business on their cell phones. Under these circumstances, the Court finds Peraton had control over the text messages . . . ."); *Colonies P'rs, L.P. v. Cty. of San Bernardino*, 2020 WL 1496444 (C.D. Cal. Feb. 27, 2020) (holding that the defendant had a duty to preserve employee's personal emails and text messages and stating "[a]dditionally, although the County did not necessarily have direct access to the personal emails and text messages, Ramos was an employee of the County engaging in County business and business that implicated Plaintiffs on his devices and campaign email. Additionally, as a Defendant in the case, and defending Ramos—an employee—and responsible for any potential judgment in Plaintiffs' favor, a duty to preserve ESI can be imputed to the County."), *report and recommendation adopted*, 2020 WL 1491339 (C.D. Cal. Mar. 27, 2020); *see also Alter v. Rocky Point Sch. Dist.*, 2014 WL 4966119, at \*10 (E.D.N.Y. Sept. 30, 2014) ("Finally, Defendants claim that they were not obliged to preserve work-related ESI which employees such as Defendant Superintendent Ring utilized on their personal computers. However, to the extent that the School District employees had documents related to this matter, the information should have been preserved on whatever devices contained the information (*e.g.*[,] laptops, cellphones, and any personal digital devices capable of ESI storage."). *See generally The Sedona Conference Commentary on BYOD: Principles and Guidance for Developing Policies and Meeting Discovery Obligations*, 19 Sedona Conf. J. 495, 528 (2018) ("It should come as no surprise that ESI that falls within the scope of discovery is often stored on mobile devices. Organizations cannot ignore their discovery obligations merely because a device containing unique, relevant ESI is also used for personal purposes.");

Eliminating any doubt, the Bioverativ Hold, the Sanofi Hold, and the Sarissa Hold explicitly encompassed texts and expressly extended to personal devices as well as company-issued devices. When outside counsel advised DiPaolo about how to implement the Sarissa Hold, they specifically discussed texts and personal devices.

Denner and Sarissa therefore had an obligation to preserve the lost texts starting at least as early as February 21, 2018 (though undoubtedly that duty arose much earlier). That satisfies the first element of the Rule 37(e) test.

## 2. Are The Texts Lost?

The second issue is whether the ESI "is lost" and "cannot be restored or replaced through additional discovery." Ct. Ch. R. 37(e). "Information is lost for purposes of Rule 37(e) only if it is irretrievable from another source, including other custodians."[17] "Because [ESI] often exists in multiple locations, loss from one source may often be harmless when substitute information can be found elsewhere." AC Notes.

The plaintiff has not shown that Bonfiglio's texts are lost. Her device contained 116,868 text messages going back to January 30, 2014. Defense counsel has determined that none of her texts are responsive, but that is a different issue than spoliation. There was no failure to preserve Bonfiglio's texts, so this decision does not discuss her further.

---

[17] *Steves & Sons*, 327 F.R.D. at 107; *accord Agility Pub. Warehousing Co. K.S.C. v. Dep't of Def.*, 2017 WL 1214424, at *2 (D.D.C. Mar. 30, 2017).

Everyone agrees that the other custodians' texts are lost. The defendants do not argue that the plaintiff could obtain their texts from other sources. The plaintiff does not contend that the defendants could recover their texts by engaging in remedial efforts such as by restoring backup tapes or searching unstructured data. Denner and Sarissa might have avoided or mitigated a sanctions ruling by coming forward with other locations where the texts might be found. Given how thoroughly iMessage backs up texts to the cloud and synchs across devices, it is hard to believe that Denner, DiPaolo, and Garafalo successfully deleted all texts across all devices. But everyone agrees that they achieved that feat.

This is also not a case where discovery from other parties can fill the gap. After learning that Sarissa could not produce any responsive texts, the plaintiff subpoenaed Verizon, Denner's cell phone provider. Verizon responded that it did not maintain records of Denner's texts. To reiterate, a cellular provider will not have records for an OTT application like iMessage.

The plaintiff also subpoenaed Lazard, but Lazard could not produce any texts either. Lazard represented that Sands "no longer has the phone that he used during the relevant time period" and "his current phone does not have any text messages dating back to the relevant period." PX 16.

Deposition testimony is not a sufficient substitute. Occasionally an alleged spoliator can testify with a sufficient degree of specificity that deposition testimony will suffice to replace the lost information. *E.g.*, *Floeter v. City of Orlando*, 2007 WL 486633, at *6 (M.D. Fla. Feb. 9, 2007) (denying sanctions where spoliator testified in

36

such detail about the type, number, and content of lost emails that the trier of fact did not need to see the emails to understand their contents). That is the exception, not the rule. When custodians cannot recall the details of the texts, whom they texted, or other key information, then depositions do not remedy the loss of evidence. *Skanska USA*, 340 F.R.D. at 187.

During his deposition, Denner's memory repeatedly failed him.

- He had no memory of any phone calls with Sands of Lazard in early May of 2017 about Sanofi's interest in Bioverativ. PX 21 at 6.

- He had no recollection of Sanofi making its initial expression of interest at about a 66% premium to market. *Id.* at 9.

- He had no recollection of telling anyone to begin accumulating a position in Bioverativ stock. *Id.* at 10–11.

- He could not recall a meeting with Sands of Lazard in May 2017. *Id.* at 20. Nor could he recall generally meeting with Sands during that period. *Id.* at 21–22.

- He could not recall calls a series of calls with Sands during May 2017. *Id.* at 28–35, 50.

- He did not recall any discussions with anyone about the short-swing profit rule. *Id.* at 56–57.

- He did not recall a meeting with Sands in October 2017. *Id.* at 63.

- He did not recall any substantive conversations with Sands during October 2017. *Id.* at 64–65.

- He could not recall whether "us" meant "Sarissa" or 'Bioverativ" and "them" meant "Sanofi." *Id.* at 66.

- He did not recall discussions with Sands in January 2018. *Id.* at 78–79.

- He did not recall attempting to revise the proxy statement to assert that Posner reported to each director about Sanofi's original offer. *Id.* at 87.

Add to this that the defendants have provided information about the spoliation belatedly and begrudgingly. Testimony from defense witnesses will not suffice.

The texts are well and truly lost. That satisfies the second element under Rule 37(e).

### 3. Were The Texts Lost Due To A Failure To Take Reasonable Steps To Preserve Them?

The third question is whether the ESI was lost "because a party failed to take reasonable steps to preserve it." Ct. Ch. R. 37(e). ESI discovery involves five fundamental steps: (1) identification, (2) preservation, (3) collection, (4) review, and (5) production. *DR Distribs., LLC v. 21 Century Smoking, Inc.*, 513 F. Supp. 3d 839, 923 (N.D. Ill. 2021).[18] The issues here are identification and preservation.

When a duty to preserve evidence arises, a party must act reasonably to preserve the information that it knows, or reasonably should know, could be relevant to the litigation, including what an opposing party is likely to be request.[19] The standard is reasonableness. Parties need not "preserve every shred of paper, every e-mail or electronic document, and every backup tape." *Zubulake IV*, 220 F.R.D. at 217.

---

[18] Judge Iain Johnston's decision in *DR Distributors* takes a deep dive into the discovery process with a particular focus on ESI and attendant obligations. It also provides helpful citations to authoritative treatises and other sources. The analysis in *DR Distributors* is spot on for Delaware cases.

[19] *See In re Shawe & Elting LLC*, 2016 WL 3951339, at *16 (Del. Ch. July 20, 2016), *aff'd sub nom. Shawe v. Elting*, 157 A.3d 142 (Del. 2017); *accord Steves & Sons*, 327 F.R.D. at 107 ("Once a party reasonably anticipates litigation, it must preserve what it knows, or reasonably should know, is relevant in the anticipated action, is reasonably calculated to lead to the discovery of admissible evidence, or is reasonably likely to be requested during discovery.") (cleaned up).

Taking reasonable steps to preserve evidence requires first taking reasonable steps to identify the information that should be collected and preserved. *See Skanska USA*, 340 F.R.D. at 186. That process requires "locating the relevant people and the locations and types of ESI." *DR Distribs.*, 513 F. Supp. at 927. "The relevant people are the individuals who have custody of the relevant ESI or the ability to obtain the ESI. Counsel must interview them to learn the relevant facts regarding ESI and to identify, preserve, collect, and produce the relevant ESI." *Id.* "The relevant locations are those places where the ESI can be found so that it can be both (a) preserved and (b) collected and produced. Although both are necessary, preserving ESI is distinct from collecting and producing ESI." *Id.*

Identifying custodians and locations requires an intentional and systematic approach that includes custodian interviews. *Id.*at 924.

> As with an initial client interview, a reasonable custodian interview can require counsel to cross-examine the client and test the accuracy of the client's response to document requests to ensure that all appropriate sources of data have been searched and that responsive ESI has been collected—and eventually reviewed and produced. Simply relying on a client's say so may not be reasonable. And like an initial client interview, the custodian interview can be an iterative process, requiring follow up.

*Id.* at 927 (citations omitted). "[T]the custodian interview is not merely a theoretical best practice. Instead, like the initial client interview, a proper and thorough custodian interview is mandated by the Federal Rules of Civil Procedure and the Rules of Professional Conduct." *Id.* at 926–27. The same is true under this Court's rules.

After identifying the reasonably likely sources of information, the party must take reasonable steps to collect and preserve it. "Though a party need not preserve

all documents in its possession—again, perfection is not the standard—it must preserve what it knows and reasonably ought to know is relevant to possible litigation and is in its possession, custody, or control." *Id.* at 929. When considering what is reasonable, a court "should be sensitive to the party's sophistication with regard to litigation in evaluating preservation efforts; some litigants, particularly individual litigants, may be less familiar with preservation obligations than others who have considerable experience in litigation." AC Notes.

For an organization, simply circulating a litigation hold is not enough.[20] The organization must take steps to ensure that the recipients of the hold understand what it means and abide by it.[21] The organization also must suspend or modify

---

[20] *DR Distribs.*, 513 F. Supp. at 933 ("The issuance of a litigation hold does not end counsel's duty in preserving ESI. . . . They must continue to monitor and supervise or participate in a party's efforts to comply with the duty to preserve.") (citations omitted)); *see Youngevity Int'l v. Smith*, 2020 WL 7048687, at *3 (S.D. Cal. July 28, 2020) (finding that litigation hold consisting of a conference call with unidentified defendants was insufficient where custodians "took no affirmative steps to preserve text messages, resulting in their deletion."); *CrossFit, Inc. v. Nat'l Strength & Conditioning Ass'n*, 2019 WL 6527951, at *9 (holding retention policies under litigation hold remained unreasonable); *Apple Inc. v. Samsung Elecs. Co.*, 888 F. Supp. 2d 976, 983 (N.D. Cal. 2012) (finding steps taken to implement litigation hold were insufficient); *see also Procaps, S.A. v. Patheon, Inc.*, 2014 WL 800468, at *2 (S.D. Fla. Feb. 28, 2014) (awarding attorneys' fees, in part, because counsel "failed to realize that its client never actually implemented the litigation hold. . . .").

[21] *See Skanska USA*, 340 F.R.D. at 186 ("[N]ot only did Skanska fail to collect the cell phone data when the litigation hold was put in place, but Skanska failed to ensure its employees, particularly those who had any role to play with regard to securing the barges or preparing for Hurricane Sally, understood its litigation hold."); *Alter*, 2014 WL 4966119, at *10 (finding it "troubling" that the litigation hold was not communicated to key players and holding overwriting backup drives constituted a breach of obligation).

routine document retention or document destruction policies so that evidence is not lost.[22]

Individuals must take similar steps. Pertinent to this case, they must disable auto-delete functions that otherwise would destroy emails or texts.[23] "It takes, at most, only a few minutes to disengage the auto-delete function on a cell phone." *Paisley Park*, 330 F.R.D. at 233. They also must back up data from personal devices before disposing of them.[24] Failing to either disengage the auto-delete setting or to

---

[22] *Steves & Sons*, 327 F.R.D at 108 (observing that a party generally must "suspend its routine document retention/destruction policy and put in place a 'litigation hold' to ensure the preservation of relevant documents.") (cleaned up)); *Zubulake IV*, 220 F.R.D. at 218 (same); *see Skanska USA*, 340 F.R.D. at 186 (finding that organization failed to meet its preservation obligations where it "failed [to] suspend its routine document destruction policies, which allowed employees to delete text messages, and did not require cell phone data to be backed up.").

[23]*See Gener8*, 2023 WL 6381635, at *14 (finding that individual acted unreasonably when "[h]e did not disable the auto-delete function on his email" and "never stopped deleting his texts . . . ."). Many federal cases stand for the same proposition. *E.g.*, *Youngevity*, 2020 WL 7048687, at *2 ("The Relevant Defendants' failure to prevent destruction by backing up their phones' contents or disabling automatic deletion functions was not reasonable because they had control over their text messages and should have taken affirmative steps to prevent their destruction when they became aware of their potential relevance."); *CrossFit*, 2019 WL 6527951, at *8 (S.D. Cal. Dec. 4, 2019) (holding failure to modify default settings to prevent destruction of emails was not reasonable because the party was on notice of their duty to preserve); *Paisley Park*, 330 F.R.D. at 233–35 (finding spoliating party failed to take reasonable steps to preserve text messages when multiple defendants failed to suspend auto-delete function on their phones).

[24] *E.g.*, *Freeman v. Giuliani*, 2023 WL 5600316, at *13 (D.D.C. Aug. 30, 2023) ("With respect to preserving ESI on phones or other electronic devices, courts have normally held that litigants must prevent destruction of ESI on such devices by backing up the data to that device's cloud network."); *Youngevity*, 2020 WL 7048687, at *2 ("The Relevant Defendants' failure to prevent destruction by backing up their phones' contents or disabling automatic deletion functions was not reasonable because they had control over their text messages and should have taken affirmative steps to prevent their destruction when they became aware of their potential relevance."); *Laub v. Horbaczewski*, 2020 WL 9066078, at *4 (C.D. Cal. July 22, 2020) (finding plaintiff failed to take reasonable steps when he "chose not to backup his text messages that were stored on his iPhone."); *Paisley Park*, 330 F.R.D. at 233 (finding

back up messages before deleting them "is sufficient to show" that a defendant "acted unreasonably."[25]

An individual cannot claim ignorance. After receiving a litigation hold, an individual must take steps to determine what is necessary to comply. That obligation includes learning of systems "to prevent destruction or automatic deletion." *Youngevity*, 2020 WL 7048687, at *2. As one court explained,

> Defendant Kormanis reasonably should have investigated (or asked his counsel, who received the letter, to investigate) (a) what text messages his iPhone held, and (b) whether any setting on his iPhone might cause the deletion of existing or future text messages. Defendant Kormanis did not take that basic step and his unreasonable failure to do so led to the loss of text messages he should have preserved. Next, . . . Defendant Kormanis should have obtained appropriate advice about saving back-up copies of his text messages . . . .

*NuVasive, Inc. v. Kormanis*, 2019 WL 1171486, at *8 (M.D. N.C. Mar. 13, 2019), *report and recommendation adopted*, 2019 WL 1418145 (M.D. N.C. Mar. 29, 2019).

Put simply, "in cases involving ESI, to satisfy their preservation duties, parties must investigate and disable autodelete functions on email accounts (client and web-based) at the onset of litigation if those accounts reasonably contain relevant

---

parties failed to take reasonable steps when they did not use the "relatively simple options to ensure that their text messages were backed up to cloud storage."); *Brewer v. Leprino Foods Co., Inc.*, 2019 WL 356657, at *10 (E.D. Cal. Jan. 29, 2019) (finding party failed to take reasonable steps where the was "no effort to back-up or preserve the Galaxy S3 prior to its loss . . . .") (cleaned up); *Gaina v. Northridge Hosp. Med. Ctr.*, 2018 WL 6258895, at *5 (C.D. Cal. Nov. 21, 2018) (similar).

[25] *Paisley Park*, 330 F.R.D. at 233; *accord Mod. Remodeling, Inc. v. Tripod Hldgs., LLC*, 2021 WL 3852323, at *10 (D. Md. Aug. 27, 2021); *see Steves & Son.*, 327 F.R.D. at 108–09 (explaining that to suspend an automatic delete policy would "at worst" clutter a party's inbox, which is a "reasonable burden to assume" in the context of litigation).

information and it is reasonable under the circumstances of the case to do so." *DR Distribs.*, 513 F. Supp. 3d at 931. The same duties apply to text messages or other types of messaging applications.

Counsel's role in this process is essential. The obligation to preserve evidence "runs first to counsel, who has a duty to advise his client of the type of information potentially relevant to the lawsuit and of the necessity of preventing its destruction." *Orbit One Commc'ns. v. Numerex Corp.*, 271 F.R.D. 429, 437 (S.D.N.Y. 2010) (cleaned up).

### a. The Failure To Take Reasonable Steps In Response To The Bioverativ Hold

Under these principles, Denner and Sarissa failed to take reasonable steps to preserve ESI after receiving the Bioverativ Hold. Starting on February 21, 2018, Denner and Sarissa had a legal duty to preserve evidence, including ESI, relating to the Bioverativ-Sanofi transaction. As a highly sophisticated party and the principal of an activist hedge fund, Denner was obligated to consult with counsel about his preservation obligations, identify likely sources of information, and take steps to preserve them.

After Denner received the Bioverativ Hold, he should have met with DiPaolo to identify the key individuals at Sarissa who were involved with the transaction, including Sarissa's trading in Bioverativ stock. At a minimum, those individuals would have included Denner himself, DiPaolo, and Garofalo, the head trader who carried out Sarissa's purchases. They logically should have considered Bonfiglio as Chief Compliance Officer, but her omission was not-consequential.

43

Denner and DiPaolo also should have identified the key locations where data could be kept. Through that evaluation, they should have identified Denner's assistant as a custodian. Eighteen months later, Denner and DiPaolo identified Denner's assistant as a custodian in response to the SEC subpoenas. They should have figured that out in February 2018.

After identifying those five custodians, Denner and Sarissa should have taken steps to preserve ESI, including by imaging phones or backing up their data. The Bioverativ Hold expressly extended to ESI on personal phones. In a world where people primarily communicate using personal devices, it will almost always be necessary to image or backup data from phones.

If Denner and Sarissa had proceeded in that fashion, they would have learned that Garafalo had set his phone to delete texts automatically after thirty days and could have instructed him to turn off that function and take steps to preserve his data. Texts from before the date he turned off the auto-delete function would have been lost, but Denner and Sarissa would have known about the lost texts in February 2018 and could have investigated what other sources of data were available at that time. Perhaps they would have come to the same conclusion that they reached in December 2022, when they finally looked at Garofalo's phone, and decided his texts were irretrievably lost. If they had acted earlier, they would have had more alternatives.

If Denner and Sarissa had proceeded in that fashion, they would now have data from the phones belonging to Denner, his assistant, and DiPaolo. Those texts

44

were lost because Denner and Sarissa failed to take reasonable steps to identify and preserve ESI in response to the Bioverativ Hold.

**b.    The Failure To Take Reasonable Steps In Response To The Sanofi Hold**

Just as Denner and Sarissa failed to take reasonable steps to preserve ESI after receiving the Bioverativ Hold, they also failed to take reasonable steps to preserve ESI after receiving the Sanofi Hold on March 15, 2018. The steps that should have been taken after the Sanofi Hold are identical to the steps that should have been taken after the Bioverativ Hold, with the additional qualifier that the second hold should have made the necessity of those steps all the more apparent.

If Denner and Sarissa had taken those reasonable steps, it would not have made a difference for the texts on Garofalo's phone. It would have made a difference for the phones belonging to Denner, his assistant, and DiPaolo, where the texts would have been preserved. Those texts were lost because Denner and Sarissa also failed to take reasonable steps to identify and preserve ESI in response to the Sanofi Hold.

**c.    The Failure To Take Reasonable Steps To Implement The Sarissa Hold**

In addition to failing to take reasonable steps to preserve ESI after the Bioverativ Hold and the Sanofi Hold, Denner and Sarissa failed to take reasonable steps to implement the Sarissa Hold. DiPaolo issued the Sarissa Hold on September 5, 2019, after Sarissa received the SEC subpoenas on September 4. DiPaolo consulted with outside counsel about implementing the hold, yet DiPaolo and outside counsel failed to take reasonable steps to implement the hold.

45

If Denner and Sarissa had fulfilled their preservation obligation after the Bioverativ and Sanofi Holds, then Sarissa already would have had images of, or backed up data from, those phones and could have continued to preserve them. They also would have already had an image of, or backed up data from, Denner's assistant's phone, which they could have continued to preserve. Denner and Sarissa's failures to respond to the earlier holds prevented them from responding properly to the Sarissa hold.

Taking the Sarissa Hold in isolation, Denner and Sarissa would not have breached their preservation obligations as to Denner's assistant's phone, because she left Sarissa in September 2018. One year later, her phone was no longer in Denner or Sarissa's possession, custody, or control, so they did not have an obligation to preserve it. That does not mean that Denner and Sarissa had no obligation to identify and preserve other sources where the assistant's data might have been maintained. They had an obligation to preserve ESI then in existence. But they did not have a duty, at that point, to secure the phone of an employee who had departed one year before.

For purposes of Garafalo, the analysis of the Sarissa Hold is the same as the Bioverativ and Sanofi Holds. Denner and Sarissa breached their preservation obligations by not identifying Garafalo, not instructing him to turn off his auto-delete function, not taking steps to image his phone or preserve his data, and not looking for other sources where his lost data could have been preserved.

Most significantly, Denner and Sarissa failed to fulfill their preservation obligation by not imaging or backing up data from Denner's and DiPaolo's phones. That occurred because DiPaolo seems to have pushed outside counsel to "table" the collection and imaging of personal devices by stressing that Sarissa's policies prohibited using text for business and by representing that he reviewed Denner's phone and did not identify responsive texts.

To fulfill their own obligations, outside counsel needed to be more assertive. "Relying solely on the client to identify the universe of relevant information, without reasonable inquiry to verify that the client accurately captured that universe, can lead to sources of information being overlooked."[26] "An attorney may not simply rely on custodian self-collection of ESI. Instead, counsel must test the accuracy of the client's response to document requests to ensure that all appropriate sources of data have been searched and that responsive ESI has been collected—and eventually reviewed and produced."[27] Self-collection of documents is particularly risky, because

---

[26] *DR Distributors*, 513, F.Supp.3d at 935; *see Bd. of Regents of the Univ. of Neb. v. BASF Corp.*, 2007 WL 3342423, at *2, *6 (D. Neb. Nov. 5, 2007) (imposing sanctions where counsel simply relied on employees' representations about where responsive evidence could be found); *Tarlton v. Cumberland Cty. Corr. Facility*, 192 F.R.D. 165, 170 (D. N.J. 2000) ("[Defense c]ounsel had a duty to explain to their client what types of information would be relevant and responsive to discovery requests and ask how and where relevant documents may be maintained. . . . It was not their option to simply react to plaintiff's fortuitous discovery of the existence of relevant documents by making disjointed searches, each time coming up with a few more documents, and each time representing that was all they had.").

[27] *Waskul v. Washtenaw Cty. Cmty. Mental Health*, 569 F. Supp. 3d 626, 636 (E.D. Mich. 2021) (cleaned up); *see Auriga Cap. Corp. v. Gatz Props. LLC*, 40 A.3d 839, 881 (Del. Ch. 2012) (noting that "[defendant] and his counsel also created evidentiary uncertainty by leaving to [the defendant] himself the primary role of collecting responsive documents, and having had [the defendant], who appears not to have been adequately counseled by his legal

clients may not remember or understand where ESI can be located, may not collect ESI correctly, or may not find or provide counsel with all responsive documents. *See DR Distribs.*, 513 F. Supp. 3d at 935–36. Self-collection also puts an interested party in charge of the effort, which may result in the conscious or subconscious omission of damaging documents. *Id.* at 936. And clients may not fully document how they conducted their collections, which is necessary to defend a collection and preservation process when challenges arise. *Id.* at 937.

Outside counsel should have given little weight to DiPaolo's representation that no one used texts because it was contrary to Sarissa policy. Outside counsel should have reviewed both Denner's phone and DiPaolo's phone. A reasonable preservation effort would have resulted in counsel imaging or backing up both phones. By failing to take these steps, Denner and Sarissa breached their duty to preserve evidence.

Denner and DiPaolo also breached their preservation obligation by failing to follow outside counsel's instructions about preserving evidence. Despite mistakenly tabling the collection and imaging of personal devices, outside counsel gave DiPaolo and Sarissa explicit advice about preserving texts. At two successive meetings, outside counsel asked for users to preserve text messages and check with counsel before buying a new phone and transferring data to a new device. There is no evidence that anyone did that.

---

advisors, delete relevant documents while litigation was either pending or highly likely.") (footnotes omitted), *aff'd*, 59 A.3d 1206 (Del. 2012).

If Denner and Sarissa had taken those reasonable steps, texts from Denner and DiPaolo would still exist. Those texts were lost because Denner and Sarissa failed to take reasonable steps to identify and preserve ESI in response to the Sarissa Hold.

### d. The Failure To Take Reasonable Steps To Preserve Documents In Response To This Litigation

Finally, Denner and Sarissa failed to take reasonable steps to preserve documents in response to this litigation. The plaintiff filed this case in December 2020. Denner and Sarissa did not do anything to identify and preserve sources of ESI until November 2021, after the court denied the defendants' motion to stay discovery. Serendipitously for Denner, his texts disappeared just weeks before.

After the plaintiff filed this litigation, all of the defendants had an obligation to identify potential sources of evidence and take steps to preserve them. For Denner and Sarissa, that meant reviewing what had already been collected, evaluating what else should be collected, and taking steps to preserve that evidence.

As part of that process, defense counsel should have imaged or backed up Denner's and DiPaolo's phones. That did not happen. The affidavits that DiPaolo and defense counsel submitted show no meaningful efforts to identify and preserve potential sources of evidence until November 2021, after the court denied the defendants' motion to stay. At that point, defense counsel checked what existed from the SEC collection in 2019, but otherwise remained passive. Rather than taking affirmative steps to identify custodians and locations, Defense counsel waited for the plaintiff to identify sources.

If defense counsel had acted when the plaintiff filed this litigation, they would have determined that no one ever imaged Denner and DiPaolo's phones as part of the SEC production. Defense counsel should have promptly informed the plaintiff about the loss of DiPaolo's data and taken steps to image Denner's phone. Working collaboratively, the parties might have agreed on other steps to preserve data and avoid another mishap like DiPaolo's errant repair after the pool cleaning incident. Denner's data would have been preserved well before October 2021, when his texts—but seemingly no other data—were permanently and irretrievably lost. In short, texts were lost because Denner and Sarissa failed to take reasonable steps to identify and preserve ESI after this litigation was filed.

### e. The Failure To Provide Timely Disclosure

When defending their conduct, the defendants and their counsel have stressed what they did after November 2021, when they began considering their discovery obligations. They have also stressed the efforts they took after the plaintiff informed the defendants in June 2022 that Denner sent texts relating to Bioverativ. That was too late and too little.

In their post-November 2021 and post-June 2022 efforts, the defendants were reactive. Instead of seeking to fulfill their discovery obligations, they sought to respond to the plaintiff's inquiries. The defendants had an independent obligation to identify and preserve evidence. They did not take reasonable steps to fulfill it.

In their post-November 2021 and post-June 2022 efforts, defense counsel failed to provide timely and candid information to the plaintiff. It was not until October 2022 that defense counsel revealed how Denner had lost his texts. That information

50

should have been provided shortly after March 2022, when defense counsel determined that Denner had no texts on any of his devices from before October 2021.

Defense counsel was all the more dilatory in providing information about other custodians. In June 2022, the plaintiffs asked about DiPaolo, Garafalo, Bonfiglio, and Denner's assistant. It took until February 2023—eight months later—for defense counsel to provide any information about those custodians, and at that point defense counsel offered no explanation for DiPaolo not having any texts. Even in January 2024, when the court held a hearing on the sanctions motion, defense counsel could not provide any explanation the absence of DiPaolo's texts. No one addressed that issue until the court ordered defense counsel to provide an affidavit describing their collection efforts. Defense counsel described what they had done, and DiPaolo provided a separate affidavit in which he described the swimming pool incident and subsequent repair gone wrong.

"Electronic discovery requires cooperation between opposing counsel and transparency in all aspects of preservation and production of ESI." *William A. Gross Const. Assocs., Inc. v. Am. Mfrs. Mut. Ins. Co.*, 256 F.R.D. 134, 136 (S.D.N.Y. 2009); *see Beard Rsch.*, 981 A.2d at 1187 (calling for "early and, if necessary, frequent communications among counsel" regarding ESI). A problem like spoliation rapidly festers. Defense counsel should have disclosed it earlier and with greater candor.

### 4. Determining The Appropriate Sanction

The final issue is the appropriate sanction. Like its federal counterpart, Court of Chancery Rule 37(e) authorizes sanctions to cure prejudice, then conditions an adverse inference or a default judgment on a culpable mental state. The Advisory

51

Notes to the federal rule observe that sanctions for curing prejudice should not include or have the same effect as an adverse inference or a default judgment unless the requisite mental state is shown.

Rule 37(e) establishes a framework for ESI-related sanctions that requires prejudice before sanctions can be imposed. Rule 37(e)(i) does not identify the possible sanctions that could be warranted, but the Advisory Notes to the federal rule refer to orders forbidding a party from putting on certain evidence, permitting other parties to present evidence, or authorizing arguments to the factfinder about the loss of evidence. Delaware decisions have identified additional possibilities, including orders establishing certain facts as true, precluding the use of certain evidence, striking particular pleadings or claims, modifying the burden of proof for particular issues, allowing additional discovery, entering default judgments, or awarding attorneys' fees and costs. *See* Ct. Ch. R. 37(b); *Fortis Advisors, LLC v. Dematic Corp.*, 2020 WL 6784129, at *3–4 (Del. Super. Nov. 18, 2020); *Terramar Retail Ctrs., LLC v. Marion #2-Seaport Tr. U/A/D June 21, 2002*, 2018 WL 6331622, at *14 (Del. Ch. Dec. 4, 2018).

Rule 37(e)(2) specifies a mental culpability requirement for two sanctions. Under that rule, a court may only presume that the lost information was unfavorable or enter a default judgment if a party "acted recklessly or with the intent to deprive another party of the information's use in the litigation." Ct. Ch. R. 37(e)(2).

Here, the plaintiff asks that the court to:

- presume Denner's stock purchases were motivated by Sanofi's initial expression of interest;

- preclude any testimony, from fact witnesses or experts, that would disavow scienter;

- preclude any testimony about alternative reasons for Sarissa's trades, such as a preexisting plan;

- infer that the destroyed texts would have supported plaintiffs' argument that the sale process fell outside the range of reasonableness because Denner maneuvered to secure a near-term sale that would lock in the profits from his insider trading.

These sanctions are sufficiently significant to require both prejudice and a culpable mental state.

### a. Prejudice

Rule 37(e)(1) requires that that a party have suffered prejudice before a court will impose sanctions for failing to preserve ESI. Prejudice exists when spoliation prevents a party from obtaining and potentially using relevant evidence. *See Paisley Park*, 330 F.R.D. at 236. Proving that lost evidence is relevant, however, can be difficult, precisely because the evidence no longer exists.

Like its federal counterpart, Court of Chancery Rule 37(e) does not allocate the burden of proving or disproving prejudice to one party or the other. Instead, "[t]he rule leaves judges with discretion to determine how best to assess prejudice in particular cases." AC Notes. Federal courts have taken different positions when allocating the burden of showing prejudice. There are three broad positions: (1) the requesting party generally has the burden to show prejudice; (2) the spoliating party generally has the burden of proof to show lack of prejudice; or (3) the spoliating party bears the burden to show non-prejudice if it acted with a culpable state of mind. Joyce, *supra*, at 982.

53

The majority rule imposes some level of burden on the requesting party, but decisions vary in the level of burden imposed. All strive not to make the burden too heavy. Joyce, *supra*, at 983–87 (collecting cases). In a case involving the loss of an entire hard drive, a court required only that the plaintiff explain how the lost evidence could have been relevant to the case. *Core Labs. LP v. Spectrum Tracer Servs., L.L.C.*, 2016 WL 879324, at *2 (W.D. Okla. Mar. 7, 2016). Another line of cases requires "plausible, concrete suggestions" about what the lost evidence could have shown.[28] A more demanding requirement calls for "some evidence regarding the particular nature of the missing ESI . . . ." *Eshelman v. Puma Biotechnology, Inc.*, 2017 WL 2483800, at *5 (E.D. N.C. June 7, 2017).

A minority of district courts place the burden on the non-producing party to show a lack of prejudice. Joyce, *supra*, at 987. The rationale for the burden shift is that the spoliating party is better positioned to know what evidence was destroyed and "should not be able to benefit from its wrongdoing." Joyce, *supra*, at 987–88. That approach also comports with the Advisory Committee notes to the federal rule, which suggest it is reasonable for the requesting party to bear the burden when the nature of the lost information is self-evident, the information seems relatively unimportant, or the remaining preserved information appears sufficient to meet all parties' needs. As a general rule, the Advisory Committee observes that "[d]etermining the content

---

[28] *Matthew Enter., Inc. v. Chrysler Grp. LLC*, 2016 WL 2957133, at *4 (N.D. Cal. May 23, 2016); *accord TLS Mgmt. & Mktg. Servs. LLC v. Rodriguez-Toledo*, 2017 WL 1155743, *1 (D.P.R. 2017); *Hynix Semiconductor Inc. v. Rambus Inc.*, 897 F. Supp. 2d 939, 981 (N.D. Cal. 2012) (quoting *Micron Tech., Inc. v. Rambus Inc.*, 645 F.3d 1311, 1328 (Fed. Cir. 2011)).

of lost information may be a difficult task in some cases, and placing the burden of proving prejudice on the party that did not lose the information may be unfair." AC Notes.

A small number of courts, including the District of Delaware, have analyzed the non-producing party's mental state first. Joyce, *supra*, at 990, 992. If there is evidence that the non-producing party destroyed evidence intentionally, then the court may infer that the evidence was unfavorable, shifting the burden of proof to the non-producing party to show lack of prejudice.[29] "The primary justifications for this approach are that only the party engaged in the destruction of evidence can know how much prejudice was caused by the spoliation, and it is unlikely that the non-spoliating party will be able to prove what was contained within the destroyed information." Joyce, *supra*, at 990. That is the same rationale for shifting the burden to the non-producing party in the first place, but the additional requirement of showing bad faith narrows the situations when the burden shifts.

Based on how Delaware approaches disputes over relevance, a plaintiff seeking to establish prejudice under Rule 37(e) must provide a plausible explanation as to why the evidence could have been relevant such that the failure to preserve is prejudicial. When a party seeks discovery under Rule 26(b)(1), the party bears an initial burden to "provide some minimal explanation as to why the discovery satisfies the requirements of relevance and conditional admissibility." *In re Appraisal of Dole*

---

[29] *E.g.*, *Ala. Aircraft*, 319 F.R.D. at 743–44; *GN Netcom, Inc. v. Plantronics, Inc.*, 2016 WL 3792833, at *9 (D. Del. July 12, 2016).

*Food Co., Inc.*, 114 A.3d 541, 551 (Del. Ch. 2014) (collecting authorities). The party

opposing discovery then must "show that the explanation is erroneous and that the

Rule 26(b)(1) standard has not been met." *Id.*

Likewise when showing prejudice from spoliation, the requesting party must

provide some minimal explanation as to why the lost ESI could have been relevant

and either admissible in its own right or reasonably likely to lead to the discovery of

admissible evidence. At that point, the party that failed to preserve the ESI must

convince the court that the lost material could not have been relevant, would not have

been admissible or potentially led to the discovery of admissible evidence, or

otherwise could not have been used by the requesting party to its advantage.

In this case, the plaintiff has shown prejudice. The extant record is virtually

devoid of contemporaneous documents about Sarissa's purchases, yet someone at

Sarissa approved them, someone informed DiPaolo so that he could reach out to

Bioverativ's general counsel to ask about them, and someone told the head trader to

start and stop buying. There are no substantive internal Sarissa emails about the

purchases. The only email that references the purchases involved Denner

encouraging the head trader to "[k]eep going." PX 3. There are no communications

about *why* Sarissa octupled its stake so rapidly, but in internal Lazard notes, the

bankers expressed the view that Denner turned down a high offer outright in May

2017 because "Denner would like to build up a stake in the firm prior to selling." PX

2. Lazard later reported that Sanofi viewed Sarissa's massive purchases of stock in

May 2017 as "a positive for the deal" from Sanofi's perspective. PX 4. The no-longer extant texts plausibly could have shed light on all of those issues.

The extant record is also virtually devoid of contemporaneous documents from within Sarissa about Sanofi's acquisition of Bioverativ. The only substantive internal emails from Sarissa about the acquisition involve Denner and DiPaolo discussing the Schedule 14D-9, after the deal was signed. The no-longer-extent texts inferably would have included exchanges between Denner and Sands about Sanofi's attempts to engage. They also inferably would have included exchanges about the negotiations that Denner led on behalf of Bioverativ after October 2017. *See* PXs 5, 7, 23 at '15827.

If the texts existed, the plaintiff could use them to prove their affirmative case. But that is not the only harm the plaintiff has suffered. Denner and Sarissa intend to present testimony at trial about a preexisting plan to purchase stock, such that the timing of Sarissa's sudden and significant investment was unrelated to Sanofi's offer. If the plaintiff had access to contemporaneous texts, the plaintiff could have used the texts to cross-examine the defense witnesses and impeach their story.

Denner and Sarissa lack any credible response. The plaintiff has pointed to prejudice, and the defendants have not shown that it does not exist.

### b.    The Sanctions Necessary To Cure The Prejudice

Rule 37(e)(1) authorizes the court to impose sanctions as necessary to cure the prejudice. For sanctions to alleviate the harm in this case, they must address both of its dimensions. They must address the lack of evidence that the plaintiff has to prove its affirmative case and compensate for the greater ability of the defendants to testify with impunity.

57

To address the first issue, the court will presume at trial that Denner and Sarissa traded based on Sanofi's initial approach. The court also will presume at trial that the lost texts would have supported plaintiffs' position that the sale process fell outside the range of reasonableness because Denner maneuvered to secure a near-term sale that would lock in the profits from his insider trading.

Both presumptions are rebuttable. Under Delaware Rule of Evidence 301, "[i]n a civil case, unless a statute or these Rules provide otherwise, the party against whom a presumption is directed has the burden of proving that the nonexistence of the presumed fact is more probable than the existence of the presumed fact." D.R.E. 301; *see Alaska Elec. Pension Fund v. Brown*, 988 A.2d 412, 418 n. 19 (Del. 2010) ("Delaware law does not embrace the 'bursting bubble' rule adopted by the Federal Rules of Evidence.").

This is a meaningful sanction. Although Delaware decisions assert that presumptions and their close cousin—the burden of proof by a preponderance of the evidence—merely determine how a judge rules when the evidence is precisely in equipoise,[30] that is an incomplete description of their effect. Far more often, they

---

[30] *See In re S. Peru Copper Corp. S'holder Deriv. Litig.*, 52 A.3d 761, 792 (Del. Ch. 2011) (asserting that "the burden becomes relevant only when a judge is rooted on the fence post and thus in equipoise . . . ."), *aff'd sub nom. Ams. Mining Corp. v. Theriault*, 51 A.3d 1213 (Del. 2012); *In re Cysive, Inc. S'holders Litig.*, 836 A.2d 531, 548 (Del. Ch. 2003) (asserting that the practical effect of shifting the burden of persuasion under a preponderance standard "is slight" because "the outcome of very few cases hinges on what happens if . . . the evidence is in equipoise."). If allocating the burden of proof was such a non-issue, then it would be strange for it to be an issue of law that warrants reversal when mis-imposed. *Compare State Farm Mut. Auto. Ins. Co. v. Spine Care Del., LLC*, 238 A.3d 850, 858–60 (Del. 2020) (reversing trial court for misallocating burden of proof), *with Jud. Watch, Inc. v. Univ.*

58

determine what happens if there is no credible evidence on a topic, or if there is some credible evidence, but not enough that either side could carry a burden by a preponderance. In each of those common situations, the party favored by the presumption prevails. The party with the burden loses.[31]

In this case, the presumption could be outcome-determinative. The plaintiff has represented that no contemporaneous evidence exists on particular topics. If so, and if the court discredits the testimony of Sarissa's witnesses, then neither party could carry a burden. The side with the burden loses; the side with the presumption

---

*of Del.*, 267 A.3d 996, 1008 (Del. 2021) (rejecting request for reversal based on misallocation of burden of proof).

[31] For a concrete example of the latter scenario, assume three equally likely scenarios. With each one-third likely, none prevails by a preponderance. For a concrete example of the former scenario, recall the debates over appraisal arbitrage and the inability of anyone to prove under the federally imposed system of immobilized record ownership how individual shares were voted. Whoever bore the burden of proof would lose. If an investor bought shares in the public market after the record date, no one could match the shares to a proxy and determine how the shares were voted. If the investor bore the burden of proving that those shares were not voted in favor of the merger, then the investor could not seek appraisal. *See In re Appraisal of Transkaryotic Therapies, Inc.*, 2007 WL 1378345, at *1–2 (Del. Ch. May 2, 2007).

For a more recent example, consider the problem of proving whether a dispositive number of stockholders relied on a material misstatement or omission for purposes of establishing damages for a disclosure claim. As a practical matter, it is impossible to gather first-hand evidence about whether thousands of stockholders relied on a particular misstatement or omission. If a class plaintiff bears the burden of proving reliance, then class claims for damages from disclosure claims cannot succeed. *See In re Columbia Pipeline Grp., Merger Litig.*, 299 A.3d 393, 494 (Del. Ch. 2023) ("The only reasonable takeaway from the Dismissal Decision was that the plaintiffs would have to prove reliance, causation, and quantifiable damages. TransCanada's post-trial argument called attention to the implications of such a rule—a practical impossibility to recover class-wide compensatory damages for breaches of the duty of disclosure.").

wins. Because the defendants spoliated evidence, the plaintiff should prevail in that setting.

The presumption thus helps remedy the problem created by the absence of evidence, but it does not remedy the difficulties that the plaintiff will face cross-examining Sarissa's witnesses without contemporaneous documents. To address that issue, the plaintiff asks for preclusion orders, but the court will not go that far.

Instead, the court will impose a sanction that this court previously deployed when a party engaged in spoliation: raising that party's standard of proof by one level on any issue where that party has the burden. *TR Invs., LLC v. Genger*, 2010 WL 541687, at \*2 (Del. Ch. Feb. 3, 2010). By way of example, if the defendants would have to prevail by a preponderance of the evidence, they will instead have to prevail at trial by producing clear and convincing evidence.

In *Genger*, the court went further and held that because the spoliator's conduct called his credibility into question, he "will be unable to prevail on any material factual issue if the only evidence in support of his position is his own testimony." *Id.* Under that ruling, "[a]bsent corroborating testimony or documents, [the spoliator's] mere word will be insufficient to meet his burden of persuasion." *Id.* Although the court could take that additional step in this case, the court will consider the testimony of Sarissa witnesses and give it the weight due, taking into account when the testimony is uncorroborated.

Finally, the plaintiff is awarded the reasonable attorneys' fees and expenses incurred pursing the spoliation issue, including the correspondence relating to that

issue, the subpoena issued to Verizon, and the briefing of the motion. The parties will exchange information about their respective attorneys' fees and costs and attempt to reach accord in good faith. If they cannot agree, the plaintiff may file an application.

### c. A Culpable Mental State

To remedy the prejudice that the failure to preserve ESI caused in this case, the court has awarded sanctions under Rule 37(e)(1) that include presumptions that are adverse to the defendants. Because of the significance of the presumptions, it seems likely that the court only can impose them only if Denner and Sarissa acted recklessly or intentionally. They at least acted recklessly, so that standard is met.

Under Delaware law, "[i]ntentional conduct means conduct that a person undertook with a knowing desire or with a conscious objective or purpose." *Urb. Concepts LLC v. Gruber*, 2023 WL 4423978, at *4 (Del. Super. July 7, 2023) (cleaned up). "Reckless conduct reflects a knowing disregard of a substantial and unjustifiable risk. It amounts to an 'I don't care' attitude." *Id.* (cleaned up). For purposes of spoliation, a court can find recklessness when

> an actor is under a duty to preserve evidence and takes part in the destruction of evidence while being consciously aware of a risk that he or she will cause or allow evidence to be spoiled by action or inaction and that risk would be deemed substantial and unjustifiable by a reasonable person.

*Beard Rsch.*, 981 A.2d at 1192.

### i. Denner and DiPaolo

Based on the current record, the court could find that Denner and DiPaolo acted intentionally in not preserving ESI. At a minimum, they were reckless.

A party can prove a culpable mental state through either direct or circumstantial evidence. *See Skanska USA*, 340 F.R.D. at 188; *E\*Trade Sec., LLC v. Deutsche Bank AG*, 230 F.R.D. 582, 590 (D. Minn. 2005). A court ultimately looks for evidence of a "serious and specific sort of culpability regarding the loss of relevant ESI." *Paisley Park*, 330 F.R.D. at 236 (cleaned up). This court previously found that a party "was at least reckless" in failing to preserve ESI on a personal phone where the party (i) moved to stay discovery and represented that no potentially relevant information would be in jeopardy, (ii) subsequently lost his phone, (iii) never identified any actions taken to preserve the contents of the phone—or to even consider that issue—after the duty to preserve arose and before the phone was lost, (iv) initially represented that he had no text messages and claimed that he generally did not text for business purposes. *Kan-Di-Ki, LLC v. Suer*, 2015 WL 4503210, at \*29 (Del. Ch. July 22, 2015).

Here, Denner and DiPaolo engaged in comparable conduct. Both knew about their obligation to preserve texts on their personal devices. Denner received three litigation hold notices: the Bioverativ Hold, the Sanofi Hold, and the Sarissa Hold. DiPaolo issued the Sarissa Hold. Each litigation hold discussed the need to take affirmative steps to preserve texts on personal devices.

For the Sarissa Hold, outside counsel gave DiPaolo specific advice about preserving texts. DiPaolo induced outside counsel to defer gathering texts from personal phones by representing (incorrectly) that Denner did not text and claiming

62

that he had personally reviewed Denner's texts and not found any relating to Bioverativ. The limited texts that the plaintiff has been able to obtain disprove that.

Outside counsel nevertheless instructed DiPaolo that Sarissa employees needed to preserve their texts and to consult with counsel before upgrading their phone. There is no evidence that anyone took any steps to implement that instruction.

DiPaolo lost his texts in October 2020. That was after he had personally issued the Sarissa Hold and received instructions from outside counsel on how to preserve texts.

Denner lost his texts in October 2021. That was just after the plaintiff served a document request seeking texts and just before the defendants moved to stay discovery based in part on the assertion that the plaintiff would not suffer any prejudice.

Both Denner and DiPaolo lost their texts through inexplicable failures of their phones to back up their texts from the cloud. For Denner, that supposedly happened when he upgraded his iPhone, but everyone agrees that an iPhone upgrade does not have that effect. For DiPaolo, that supposedly happened after he was personally cleaning his swimming pool, dropped the phone in the water, and then sent it to be repaired.

No one has suggested that Denner or DiPaolo lost other data from their phones. Neither have described emotionally crushing losses of beloved family photos. Neither have suggested that they had to rebuild their contacts from other sources or

repurchase all of their applications. The strange failure to transfer data to their new phones seems only to have affected their texts.

That is a lot to believe, particularly when neither explanation is credible, and when Denner and DiPaolo claim merely to be speculating about how their texts could have been lost. This court previously found a party to be reckless where the party took no steps to preserve devices and "threw up his hands up in bewilderment as to what happened to them." *Triton*, 2009 WL 1387115, at *8. That is basically what Denner and DiPaolo have done.

Both Denner and DiPaolo have averred that they never intentionally deleted any texts. The objective facts speak more loudly. Denner's failures to recall anything about more memorable issues provide additional reason to question whether he would accurately remember intentionally deleting texts. DiPaolo's failure to identify texts on Denner's phone about Bioverativ, when we now know Denner sent them, provides additional reason to question whether he would know whether he intentionally deleted texts.

Denner and DiPaolo had ample motive to delete their texts. The texts violated Sarissa's internal policies and federal record keeping laws. They could have (i) subjected the defendants to fines, (ii) incriminated them in an SEC investigation, (iii) supported the plaintiff's claims, or (iv) undermined the defendants' explanations. Denner and DiPaolo also had the opportunity and ability to delete their texts, because their devices were never imaged or backed up.

For purposes of sanctions under Rule 37(e)(2), recklessness is sufficient. For now, the court finds only that Denner and DiPaolo acted recklessly. Both sides may present evidence regarding spoliation at trial. As part of its post-trial findings, the court may revisit this issue and evaluate whether Denner and DiPaolo's conduct went beyond recklessness to reach the level of intentionality.

### ii. Sarissa

Just as the court could find that Denner and DiPaolo acted intentionality, the court could reach the same finding regarding Sarissa. Here again, the court finds only that Sarissa was at least reckless.

There are multiple paths to finding Sarissa acted with culpable intent. The most straightforward is imputation. When senior officers of an investment firm act with a particular state of mind, Delaware law imputes that knowledge to the firm.[32] Denner is the founder and principal of Sarissa; DiPaolo is its general counsel. When they acted recklessly, at a minimum, to spoliate evidence in a case brought against

---

[32] *See In re PLX Tech. Inc. S'holders Litig.* 2018 WL 5018535, at *49 (Del. Ch. Oct. 16, 2018) ("In this case, Singer was a co-managing member of Potomac and its agent, and his knowledge is imputed to Potomac in those capacities."), *aff'd*, 211 A.3d 137 (Del. 2019); *Carsanaro v. Bloodhound Techs., Inc.*, 65 A.3d 618, 642–43 (Del. Ch. 2013 (imputing knowledge of fund principals to investment funds for purposes of "knowing participation" element of aiding and abetting claim), *abrogated in part on other grounds by El Paso Pipeline GP Co., L.L.C. v. Brinckerhoff*, 152 A.3d 1248 (Del. 2016) (rejecting analysis of dilution claim as having both direct and derivative dimensions) *see also Metro. Life Ins. Co. v. Tremont Gp. Hldgs., Inc.*, 2012 WL 6632681, at *19 (Del. Ch. Dec. 20, 2012); *Khanna v. McMinn*, 2006 WL 1388744, at *27 (Del. Ch. May 9, 2006); *Carlson v. Hallinan*, 925 A.2d 506, 542 (Del. Ch. 2006). *Cf. Forsythe v. ESC Fund Mgmt. Co.*, 2007 WL 2982247, at *13 (Del. Ch. Oct. 9, 2007) ("These investment decisions form the basis of the plaintiffs' breach of fiduciary duty claims. Therefore, the court may infer CIBC's knowledge of the Special Limited Partner's and Investment Advisor's breaches of fiduciary duty.").

both Denner and Sarissa, their culpable state of mind is imputed to Sarissa for purposes of the spoliation motion.

Garofalo's actions in failing to turn off his auto-delete function are also attributable to Sarissa. This court has found that the failure to turn off an auto-delete feature "was at least reckless." *Gener8*, 2023 WL 6381635, at *15. Federal decisions reach the same conclusion. *See, e.g.*, *Skanska USA*, 340 F.R.D. at 185. Garafalo was Sarissa's head trader, and Sarissa had an obligation to preserve his texts. For purposes of the sanctions motion, Garofalo's recklessness is attributable to Sarissa.

### iii.    Culpability Requirement Met

The findings regarding recklessness satisfy the requirements of Rule 37(e)(2) for purposes of the sanctions that the court finds necessary to cure the plaintiff's prejudice. The court therefore need not search for alternative sanctions that would be less well suited to the harm the plaintiff suffered.

### III.    CONCLUSION

The motion for sanctions based on the failure to preserve ESI is granted. The allocation of burdens and presentation of evidence at trial will conform to the rulings in this decision.